103 So.2d 603 (1958)
TAMPA DRUG COMPANY, a Corporation, Appellant,
v.
Mary Wallace WAIT, Appellee.
Supreme Court of Florida.
May 7, 1958.
Rehearing Denied June 9, 1958.
*604 Chester H. Ferguson, M. Craig Massey, Doyle E. Carlton, Macfarlane, Ferguson, Allison & Kelly and Mabry, Reaves, Carlton, Fields & Ward, Tampa, for appellant.
Cody Fowler and Margaret Deaton of Fowler, White, Gillen, Yancey & Humkey, Tampa, for appellee.
THORNAL, Justice.
Appellant Tampa Drug Company which was defendant below seeks reversal of a final judgment based on a jury verdict in favor of appellee Mary Wallace Wait who as plaintiff below claimed damages for the wrongful death of her husband.
Numerous points cited to justify reversal are discussed hereafter. In the ultimate the major propositions are the sufficiency of the complaint to state a cause of action and the sufficiency of the evidence to support the verdict and judgment.
The deceased Thomas Bryan Wait was at the time of his death the 38-year old *605 sales manager of Krauss Brothers Lumber Corporation. He and his 29-year old widow, the appellee, were the parents of three minor children. On March 19, 1954, having need for a substance to clean the floors of his home, Mr. Wait requested one Willie Richardson, the janitor for Wait's lumber company employer, to purchase for him a gallon of carbon tetrachloride which had been recommended by Richardson as an effective floor cleaning fluid. The purchase was made from appellant Tampa Drug Company which advertised itself as a "manufacturing chemist." The jug of carbon tetrachloride was delivered to Mr. Wait by Richardson. On the morning of March 20, 1954, the deceased with the assistance of one Nathaniel Morgan undertook to clean the floors of his home using the carbon tetrachloride. In doing so he poured about two inches of the liquid in an open pan. The two men then, on their hands and knees and using a piece of cloth, dipped the rag into the pan of the fluid and spread it over the floor. Both of the men noticed a strong odor emanating from the liquid. Mr. Wait worked at his project for about an hour when he complained of a headache and dizziness. He discontinued the activity but Morgan continued to work and even worked some the following day to complete the job. Morgan suffered no injury. However, by the middle of the afternoon of March 20 Mr. Wait was definitely ill. His illness became progressively worse until he died on April 2, 1954.
Several doctors testified that he died as a result of carbon tetrachloride poisoning. The record suggests that the janitor Richardson had informed Mr. Wait that a person had to be careful when using carbon tetrachloride. It was also shown that during the time that he was working with the liquid three windows and a door to the room where he was working were all open. Following the death of her husband Mrs. Wait instituted this action against Tampa Drug Company. Her complaint was framed in two counts. In one she grounded her cause on the alleged negligence of the drug company in placing on the jug of carbon tetrachloride a label which was inadequate to warn the deceased of the dangerous characteristics of the product and the fatal effects which might follow the use thereof. The other count was grounded on the alleged inadequacy of the label to warn the public of the characteristics and fatal potentialities involved in the use of the liquid. A copy of the label was attached to the complaint as an exhibit. It read as follows:
"Carbon Tetrachloride  Technical 
-------
"Useful as fire extinguisher. For cleaning clothing: solvent for fats, oils, varnishes, waxes, resins: exterminating weevils and insects in grain.
"Volatile Solvent  Vapor Harmful 
"Use with adequate ventilation 
"Avoid prolonged or repeated breathof vapor.
"Avoid prolonged or repeated contact with skin.
-------
 "Do Not Take Internally.
 "Tampa Drug Company
 "Manufacturing Chemists
 "Tampa, Florida"
Mr. Wait had read the label before using the chemical.
The testimony reveals that "carbon tetrachloride technical" means almost one hundred percent pure carbon tetrachloride. In other words, it means that the chemical has not been diluted by mixture with any other substance. It is clear from the record that this chemical can produce harmful results, even death, when taken internally, when the vapor therefrom is breathed excessively or when the skin is subjected to prolonged contact with it. The effect of excessive exposure in any one of the three forms is that the circulatory system becomes saturated with the toxic vapors with the result that the kidneys and liver completely *606 deteriorate. When this happens, of course, death results as it did in the instant case.
After motions to dismiss the complaint were denied, the appellant drug company answered by denying the negligence and by asserting that Mr. Wait by his own negligence proximately contributed to his own injury and death. In addition the drug company undertook to defend by answering that the label used was substantially that required by the so-called Federal Insecticide, Fungicide and Rodenticide Act (Sections 135-135K, Title 7, United States Code Annotated). They tendered an additional defense that the label used was substantially similar to that prescribed by the Commissioner of Agriculture of the State of Florida pursuant to Chapter 487, Florida Statutes, F.S.A., and promulgated in accord with the state statute supplemented by the federal act above cited.
The trial judge struck the defenses grounded on the state and federal statutes. The cause ultimately went to trial on the issues of negligence and contributory negligence. After a prolonged and hotly contested trial, the jury rendered a verdict in favor of Mrs. Wait in the amount of $160,000. The trial judge had previously denied appellant's motion for a directed verdict. A motion for new trial was denied. The trial judge then entered a judgment pursuant to the verdict. Reversal of this judgment is now sought.
It is contended by the appellant drug company that its motion to dismiss the complaint should have been sustained for the reason that the label therein described was sufficient as a matter of law. It is further contended that appellant's motion for a directed verdict at the close of all of the evidence should have been granted for the reason that the evidence showed no liability on the part of the drug company and on the contrary established contributory negligence as a matter of law. Appellant further contends that the trial judge committed error in striking its defenses grounded on the state and federal statutes and in addition committed numerous errors in admitting certain testimony and in giving various instructions to the jury. Finally, it is asserted that the verdict of the jury was excessive.
The appellee here contends that the trial judge ruled correctly on the pleadings, that his jury instructions as a whole correctly stated the law applicable to the case and that in the ultimate the matter was properly submitted to the jury which had abundant evidence to support its verdict.
In proceeding to our ultimate judgment we announce herewith certain controlling propositions of law. We will then apply these rules to the situation presented by the instant record. Various points and contentions urged by the parties which have not been detailed above will be covered in our consideration of the appeal in the light of the rules of law applicable.
It will be remembered that Mrs. Wait sued the drug company for its failure to warn of the dangers inherent in the use of carbon tetrachloride by virtue of the inadequacy of the label attached to the jug of the chemical which was sold to Richardson and purchased by him at Mr. Wait's request. After proceeding through the preliminary pleading stages the trial of the case revolved around the primary issue as to whether the warning printed on the label was adequate to fulfill the duty imposed by law on the appellant. Aside from the interesting testimony of various expert chemists and physicians, the trial developed into a contest of labels. The appellee-plaintiff produced in evidence numerous labels used by nationally known manufacturing chemists, all of which she contended were more complete and more thoroughly effective to warn of the dangers inherent in carbon tetrachloride as well as the potential harm that might ensue upon use of the liquid. She introduced also a label promulgated by the Manufacturing Chemists Association, a nationwide organization of leading manufacturing chemists. It developed *607 that the label was practically the same as the one used by the nationally known manufacturing chemists which she placed in evidence separately. These chemists were members of the Association.
The appellant in turn placed in evidence various labels which were used by other suppliers. These were intended to show by comparison that appellant's label was adequate. In addition appellant undertook to place in evidence a label approved by the Secretary of Agriculture of the United States under the Federal Insecticide, Fungicide and Rodenticide Act which label in the view of appellant established a standard of care. Proceeding on this notion appellant undertook to show that it had met the standard of care prescribed by the Federal Insecticide Act and regulations promulgated pursuant thereto. Although the trial judge had stricken the defenses based on the federal statute which were intended as a complete bar to the action he permitted the federally endorsed label as evidence of an adequate label consistent with appellant's contention.
In this regard it should be recalled that the liquid used by Mr. Wait was "technical" or practically one hundred percent carbon tetrachloride. The Federal Insecticide Act is a statute regulating the manufacture and distribution of insecticides, fungicides and rodenticides. The record before us appears to establish clearly that carbon tetrachloride in pure undiluted form is never used for one of these purposes. In other words, the label was approved by the Secretary of Agriculture as a minimum warning of the dangers involved in any product intended for use as an insecticide, etc., containing carbon tetrachloride to the extent of ten to twenty percent of the insecticide rather than for use to warn against the hazards of pure one hundred percent carbon tetrachloride.
We are here confronted with the problem of determining the extent of the duty of a distributor of a latently dangerous product which has a potential capacity for causing injury. We no longer need concern ourselves with a search for the presence of "privity" between the distributor and the ultimate consumer who suffers the injury. Ever since the celebrated opinion of the late Justice Cardozo in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, the courts have ceased to clothe the responsibility of the distributor with the protective cloak of the privity requirement. In other words, the obligation of the distributor of a commodity inherently burdened with a potential danger is not restricted to the individual with whom he immediately does business. It is not just a contractual obligation. It is an obligation arising out of a duty to take reasonable precautions to avoid reasonably foreseeable injuries to those who might use the commodity. See Matthews v. Lawnlite Co., Fla. 1956, 88 So.2d 299; also see Pierce v. Ford Motor Co., 4 Cir., 190 F.2d 910, certiorari denied 1951, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666; Prosser on Torts, pp. 206-210, 674-683; Restatement of the Law of Torts, Sections 388 and 398.
The measure of the duty of the distributor of an inherently dangerous commodity is now well established to be the reasonable foreseeability of injury that might result from the use of the commodity. The care exercised in fulfilling this duty is in turn measured by the dangerous potentialities of the commodity as well as the foreseeable uses to which it might be put. When a distributor of an inherently dangerous commodity places it in the channels of trade, then by the very nature of his business he assumes the duty of conveying to those who might use the product a fair and adequate warning of its dangerous potentialities to the end that the user by the exercise of reasonable care on his own part shall have a fair and adequate notice of the possible consequences of use or even misuse.
We are not here concerned with the necessity for a technical discussion of the distinctions between directions and warnings. *608 McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712. The issue here involved was the adequacy of the warning as against the alleged failure of the deceased to observe the caution suggested by the warning. The label contained no specific directions as to use for any particular purpose, although it did announce that the commodity was "useful" for certain purposes. The purpose for which Mr. Wait used it was within the stated purposes for which the label advertised that it was "useful."
We are not here dealing with liability resulting from a defect in an article that is ordinarily harmless. As previously pointed out we here consider the problem as it relates to an inherently dangerous commodity; that is, a commodity burdened with a latent danger which derives from the very nature of the article itself. With regard to this type of article the liability of the manufacturer or distributor is predicated on a failure to give adequate warning of the inherent danger. Carbon tetrachloride appears to us to be a prime example of this type of commodity. It is a clear liquid with a sharp odor similar to that which emanates from chloroform. When properly employed it has many useful purposes, such as, a cleaner, a fire extinguisher, and, in diluted portions, an insecticide. The last use appears to be going out of date. However, under certain circumstances the vapors from the chemical can be deadly as was demonstrated in this case. It can be equally fatal if taken internally. Prolonged exposure of the skin to the chemical can have fatal results. Obviously, although the product appears harmless in and of itself, it has lurking in its innocent appearance death-dealing potentialities. It is with regard to this type of product that the law imposes upon the distributor a duty to the using public. This duty simply is to take reasonable precautions to supply users with an adequate warning notice that would place them on their guard against the harmful consequences that might result from use of the commodity.
In the instant case the appellant asserts that the duty is discharged if the distributor labels the container with a notice that warns against dangers involved. The appellee appears to contend that the label should do more and warn against the potentially fatal or exact harmful consequences of misuse. We think this distinction is more apparent than real. This is so for the reason that if the label adequately warns of the danger, it appears to us that the potential harmful consequences would then become apparent from the warning. In view of the prevalence of authorities imposing this type of duty on the manufacturer or distributor of an inherently dangerous commodity, we are led to the conclusion that the plaintiff's complaint stated a cause of action and was not vulnerable to the motion to dismiss leveled against it by the defendant drug company.
We move on to the next stage of the cause. It will be recalled that the case went to the jury on the issues of negligence and contributory negligence. It is insisted by the appellant that the evidence clearly established its freedom from guilt and with equal compulsion leads to the notion that Mr. Wait was guilty of contributory negligence. In this regard appellant urges us again to hold as a matter of law that the label attached to the jug containing the deadly chemical was adequate to give notice to Mr. Wait that its use could result in his death. It is asserted that the label warned that it should be used "with adequate ventilation"; that "prolonged or repeated breathing of the vapor" should be avoided; that "prolonged or repeated contact with skin" should be avoided. It is also contended in support of appellant's position that the deceased was an alert, intelligent man who had been advised by his "agent", the purchaser of the chemical, that he should be careful. In this connection we are asked to conclude that the label was sufficient.
We wish to make clear that we do not here intend to hold that the distributor *609 of an inherently dangerous commodity is an insurer of the safety of the product which he puts in circulation. The burden remains on one who claims a negligent failure to warn of an inherent danger to prove that the distributor knew, or by the exercise of reasonable care should have known, of the potential danger and in the reasonable course of his business should be able to foresee the possible uses of the commodity as well as the potential damage or injury that might result from such use.
The differences in the warning notices placed in evidence in the case at bar rather clearly demonstrate the difference in the degree of foresight exercised by manufacturers and distributors of the same commodity. It certainly was evident from this record that the appellant drug company was thoroughly familiar with the dangers inhering in the use of carbon tetrachloride. The label which it attached to the jug stated that it was "useful" among other things as a "solvent for fats, oils, varnishes, waxes, resins". Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449. The drug company was therefore thoroughly familiar with the uses to which the commodity might be put. With this knowledge the appellant, which had been in business for many years, through its officers and agents certainly must have realized that the chemical would be used for the purpose for which it was employed by Mr. Wait. We think that with this knowledge the appellant was charged with the burden of forewarning potential users of the inherently dangerous nature of the commodity.
While some might conclude that the notice on the label quoted in the forepart of this opinion would meet the requirements of adequacy, we do not feel that such a conclusion can be reached as a matter of law. The differences in the various labels in evidence of themselves demonstrate that reasonable minds might well differ on the sufficiency of the notice furnished by this label. We think that the sufficiency of the warning to place a reasonable man on notice of the potentially fatal consequences of the commodity here involved and under the conflicting evidence in this record justified submitting the problem to the jury for determination. Similarly whether Mr. Wait exercised reasonable care for his own safety was also a jury issue. In substantial measure the degree of care required of the deceased for his own safety would bear a direct relation to the adequacy of the warning of danger.
Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. It is the failure to exercise such a degree of caution after proper warning that constitutes contributory negligence in a case such as this. Cf. Shaw v. Calgon, Inc., 35 N.J. Super. 319, 114 A.2d 278. We do not feel that the trial judge committed error in denying appellant's motion for a directed verdict and in submitting the cause to the jury.
With further reference to this point and particularly in regard to our holding on the sufficiency of the complaint, appellant relies with considerable confidence on the decision of the Supreme Court of Missouri in McClaren v. G.S. Robins & Co., 349 Mo. 653, 162 S.W.2d 856. In that case the trial judge sustained a demurrer to the evidence at the close of the testimony. He was of the view that the warning label was sufficient as a matter of law. The case was disposed of on a stipulation of facts to the effect that other manufacturers of the chemical used a similar label. This phase of the case is distinguishable from the situation presented by the instant record. Aside from that proposition, however, we do not agree that in a case such as this where the jury may draw varied inferences from the evidence properly before it that the trial judge should enter into the jury box and become an arbiter of the facts. On this score we prefer to follow *610 the views expressed by the Supreme Court of Pennsylvania in Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449. See also Tomao v. A.P. De Sanno & Son, Inc., 3 Cir., 1954, 209 F.2d 544; Hopkins v. E.I. Du Pont De Nemours & Co., 3 Cir., 1952, 199 F.2d 930; Gall v. Union Ice Co., 108 Cal. App.2d 303, 239 P.2d 48.
During the trial the judge permitted in evidence labels promulgated for the use of the chemical industry by the Labeling Committee of the Manufacturing Chemists Association. This is an organization numbering among its membership many of the major chemical manufacturing concerns in the United States. Two of the plaintiff's expert witnesses were directly connected with the organization. The labels were not allowed in evidence to establish a conclusive standard of care. They were submitted to the jury along with all of the other evidence as a basis for comparing appellant's label with others, merely as a guide to a determination of the adequacy of the warning furnished by appellant. For this purpose we have the view that they were properly allowed in evidence.
Appellant seeks reversal on the further ground that the appellee was permitted to place in evidence a portion of the regulation promulgated by the Secretary of Agriculture pursuant to the Federal Insecticide Act, the regulation being found in 7 Code of Federal Regulations, Section 362.116, et seq. With regard to this proposition we have the view that the Federal Insecticide Act in and of itself had little bearing on the issues presented to the trial court. That act deals with the registration, testing, labeling and distribution of insecticides. It is clear from this record that pure carbon tetrachloride is not used as an insecticide. The regulations promulgated pursuant to the federal act do prescribe the label for a commodity consisting of carbon tetrachloride of a strength of ten percent and above but the testimony reveals clearly that when used as an insecticide the percentage of carbon tetrachloride does not exceed twenty percent. Nevertheless, on cross examination of several witnesses the appellant over objection of the appellee was permitted to bring into evidence before the jury by reference to The Federal Register provisions of the federal regulations prescribing a form of label considered to be a minimum warning on mixtures of carbon tetrachloride of ten percent and above. Thereafter the court permitted the appellee to introduce into evidence a part of the same regulation defining economic poisons and setting out the minimum requirements for labeling thereof. As pointed out herein we think that the provisions of the federal regulation have little bearing on the instant case. Certainly the labeling provisions were at most only factually persuasive as evidence to go to the jury. They were not controlling as an absolute statutory standard of care. As a matter of fact the appellant had not registered its commodity with the United States Department of Agriculture. Under these circumstances we are led to the view that having introduced the subject by its own examination of the witnesses, the appellant is not in a position to complain that the appellee was permitted to offer evidence of a part of the same regulation to counterbalance the evidence offered by appellant itself.
In regard to the contention that the regulations of the Commissioner of Agriculture of Florida, promulgated under Chapter 487, Florida Statutes, F.S.A., should have been permitted in evidence, it is sufficient to point out that the Florida regulations were promulgated subsequent to the occurrence in litigation in the instant case. We think the court properly excluded the regulations which were not in effect when this transaction took place even if they otherwise would have had a place in the evidence.
We have not overlooked the argument for reversal grounded on alleged errors in *611 the instructions. While in a case as complex as this it is always possible that the trial judge has committed some technical error we fail to find from an examination of the instructions as a whole either that substantial error was committed or that the court erroneously advised the jury on the law to the harm of the appellant.
On the assertion that the amount of the verdict is excessive, a careful examination of the record as to the background and business potentials of the deceased as well as his earning capacity and life expectancy leads us to the conclusion that the jury did not exceed the bounds of reason in arriving at the verdict which it rendered. Sitting as jurors we, as individuals, might have arrived at a different verdict. However, there is no evidence here present that this jury, working under the guidance of an experienced trial judge, exceeded the bounds of propriety or was persuaded unduly by passion, sympathy or prejudice. We feel that the verdict is sufficiently within reason and therefore we would not be justified in setting it aside or ordering a reduction without being guilty of judicial encroachment upon the jury function.
Many hours have been spent in a careful examination of the record, a study of the authorities cited, as well as a cautious analysis of the splendid briefs submitted by able counsel for both parties. A thorough consideration of the case leads us to the conclusion that the trial was conducted in a fashion consonant with the requirements of the law and in the ultimate the solution to the problem was properly deposited with the jury. We see no reason to disturb the judgment which is 
Affirmed.
THOMAS, Acting C.J., and DREW and O'CONNELL, JJ., concur.
ROBERTS, J., dissents.