478 So.2d 444 (1985)
ADVANCE CHEMICAL Company, Appellant,
v.
Annie L. HARTER, Appellee.
No. BA-424.
District Court of Appeal of Florida, First District.
November 8, 1985.
Rehearing Denied December 6, 1985.
*445 Robert P. Gaines of Beggs & Lane, Pensacola, for appellant.
Charles J. Kahn, Jr., of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, for appellee.
SMITH, Judge.
Advance Chemical Company (Advance) appeals an adverse judgment in this products liability case in which Annie L. Harter (Mrs. Harter) recovered $200,000 damages based on her claims that Advance failed to warn of the dangerous potentialities of its product, Advance 480, causing her irreversible lung damage. Advance here maintains that the trial court should have directed a verdict. Alternatively, Advance contends that a new trial should have been granted because the jury's verdict for Mrs. Harter is against the manifest weight of the evidence. At issue here is the extent of the duty to warn of a product's dangerous propensities, and whether the duty remains in effect as to persons who may be said to suffer from an allergy, or some condition which may cause hypersensitivity with respect to a particular type of product. We affirm.
Mrs. Harter filed suit against Advance based upon theories of implied warranty, negligence in manufacture, strict liability, and negligent failure to warn users of inherently dangerous potentialities of its product. The trial court charged the jury only on two theories: breach of implied warranty, and negligent failure to warn. The jury found that Advance negligently failed to warn users of the dangerous potentialities of its product, Advance 480, but found no breach of implied warranty.
Because the legal issues on this appeal must be viewed against a factual background, we find it necessary to briefly summarize the evidence presented to the jury. Viewed in a light most favorable to Mrs. Harter, as required on appeal, the evidence shows the following: Mrs. Harter was employed by the Santa Rosa County School Board as a custodian. On April 21, 1980, she mixed Advance 480, a cleaning product, with water, according to the directions for mixing on the label and covered the floor of the office she was cleaning. She immediately had difficulty breathing and began wheezing, having bad chest pains and a headache. She reported her reaction to her supervisor. She had trouble sleeping that night because of headaches and chest pain and arranged to see Dr. Maddux the following day. After some laboratory work, Dr. Maddux had Mrs. Harter admitted to the Santa Rosa Hospital.
Advance 480 contains ammonia. The label on the container reads as follows:
Effective blend of surfactants, emulsifiers, and detergents, to rapidly and safely strip oxidized waxes from asphalt, vinyl, rubber, and linoleum tile, and terrazo or cement floors, when used as directed. *446 Contains no caustics or solvents to dull or soften tile or synthetic floor finishes. Concentrated product; efficient at high dilutions for economy. Rinse completely. Non-flammable.
DIRECTIONS
For normal wax removal, use at 3 oz. per gallon of water. The stripping action is improved by using warm water. For heavy wax buildup, may require use at 1 part to 9 or 15 parts water. Cover floor thoroughly, allow to stand 5 to 15 minutes, then remove solution containing wax with sponge pad or damp mop. Repeat if required. Test the stripping action on some types of floors before selecting final dilution. For cleaning only, use at 1 part to 30 parts cold or warm water.
CAUTION
Keep out of reach of children. Harmful if swallowed. Induce ejection and call physician. Avoid excessive contact with skin.
Noticeably absent from the label is a warning concerning inhalation of fumes.
Prior to her exposure to Advance 480, Mrs. Harter had suffered several bouts of bronchitis but she testified that she did not have the same problems prior to her exposure as she did afterwards. Dr. Maddux concurred, testifying that Mrs. Harter's symptoms were milder before her exposure to Advance 480.
After her exposure to the cleaning product, Mrs. Harter continued to suffer wheezing, chest pain, headaches, and shortness of breath up until the trial of this cause. She was hospitalized several times throughout 1980 and 1981 to alleviate her symptoms. During one such hospitalization, Dr. Maddux became concerned about Mrs. Harter's condition and had her transferred to another hospital to be seen by a lung specialist, Dr. Williams.
Dr. Williams testified that Mrs. Harter suffered from bronchospasms. He felt that her symptoms were consistent with exposure to an ammonia product, which can cause bronchospasms. In explanation, he testified that significant quantities of ammonia gas, inhaled, can cause bronchospasm resulting in permanent, irreversible damage to the lungs. Further, in low concentrations it can cause reversible lung problems, but reversible over a period of many months. Although permanent damage to the lungs is usually the result of heavy exposure, it may be caused by lower levels of exposure depending on the individual.
Dr. Williams diagnosed Mrs. Harter as having reactive airways disease. When presented with the formula of Advance 480 and asked whether there was enough ammonia in the product to have had a permanent toxic effect on Mrs. Harter, Dr. Williams responded:
A. The problem with saying yea or nay to this is one has to know how much of this solution was poured in how much water, in how much of a space, in other words, to evaluate parts per million. Ammonia gas has a very pungent odor in very, very small quantities. People who have reactive airways disease, for whatever reason, react very strongly to pungent odors of all kinds; ammonia just being one, chlorine in Chlorox being another, perfumes, any one of those things. Regardless of the minimal concentration of this, if put in a small enough space, rapidly dissipated enough, in a patient who is sensitized to develop problems, any concentration is enough to give them problems.
Q. Would that be an allergic-type reaction or a toxic-type?
A. Bob, you can't separate the two, because a toxic reaction to ammonia gas can be a bronchospasm, which may or may not be reversible. I don't understand, personally, how that differs from an allergic reaction to ammonia, given the same physical findings, bronchospasm, wheezing, shortness of breath. I think everyone is allergic to ammonia, in that all people will react, if given sufficient *447 concentration. Some will react more than others.
Q. If I understand what you're saying, she had a reaction to the inhaling of ammonia fumes, that could very well be much more severe in someone who did not have the preexisting pulmonary problems, is that correct?
A. Let me restate it. A patient who has reactive airways disease prior to their exposure to ammonia, would be much more likely to react with bronchospasm, to a lower concentration, or to the same concentration in a larger area, than a person who did not have a predisposition to this. Everyone will react at sufficient concentrations.
Both Dr. Maddux and Dr. Williams felt that Mrs. Harter's exposure to ammonia had aggravated her pre-existing lung condition. Dr. Maddux gave Mrs. Harter a 5-10% permanent partial disability of the body as a whole and he causally related her permanent impairment to her exposure to the ammonia. Although he recognized that Mrs. Harter's lung problems could be an allergic reaction, based on his knowledge of the situation, he felt that she suffered a direct injury to the lung tissue.
Mrs. Harter testified that before this incident, she did not know that ammonia could damage lungs. Mr. Callahan, the owner of Advance, testified that no claim had ever been made against the company by someone charging injury or harm through use of this product other than the claim of Mrs. Harter.
Advance contends that the law does not impose upon the manufacturer of a product the duty to warn persons with hypersensitivities which may cause them to suffer from its product unless there are a substantial number of persons who would be so affected. 2 R.D. Hursh & H.J. Bailey, American Law of Products Liability, § 12:1 (2d ed. 1974); and Grau v. Proctor & Gamble Company, 324 F.2d 309 (5th Cir.1963). Advance argues that there was no evidence that Advance 480 was harmful to the average person, but instead, the evidence shows that Mrs. Harter was a hypersensitive person who suffered an unusual reaction to the product. Under the circumstances, Advance maintains, the law did not impose upon Advance the duty to warn Mrs. Harter that due to her hypersensitivity she might suffer breathing difficulties if she inhaled fumes from the product.
In essence, Advance urges that the standard to be applied is or should be that before Mrs. Harter may recover for negligent failure to warn, she must show that Advance 480 is dangerous to the average person. We conclude that this standard imposes too great a burden upon one seeking to recover from a manufacturer for negligent failure to warn. The distributor of a commodity inherently burdened with potential danger has the duty to take reasonable precautions to avoid reasonably foreseeable injuries to those who might use the commodity. Tampa Drug Company v. Wait, 103 So.2d 603, 607 (Fla. 1958). One who claims a negligent failure to warn of an inherent danger has the burden to prove that the manufacturer or seller knew, or by the exercise of reasonable care should have known, of the potential danger in the use of the product, and, in the reasonable course of business, should have been able to foresee the possible uses of the product as well as the potential damage or injury that might result from such use. Id. at 609. In this connection an inherently dangerous product is one burdened with a latent danger which derives from the very nature of the article itself. Id. at 608. Although the Wait case speaks of the duty to warn in terms of an "inherently dangerous" product, it is clear that the duty to warn arises when the product has dangerous propensities as well. Cohen v. General Motors Corporation, Cadillac Division, 427 So.2d 389, 390 (Fla. 4th DCA 1983); and Dayton Tire and Rubber Co. v. Davis, 348 So.2d 575 (Fla. 1st DCA 1977), rev'd on other grounds, 358 So.2d 1339 (Fla. 1978). Questions of whether a product is inherently dangerous or has dangerous propensities and whether a manufacturer or distributor has a duty to warn under the circumstances are usually questions of fact for the *448 jury. Harless v. Boyle-Midway, Division of American Home Products, 594 F.2d 1051 (5th Cir.1979); Mathis v. National Laboratories, 355 So.2d 117 (Fla. 3d DCA 1978); Dayton Tire and Rubber Co. v. Davis, supra; and Tampa Drug Company v. Wait, supra.
Admittedly, it is generally held that in an action against the manufacturer or seller based upon negligent failure to warn, no liability is imposed upon the manufacturer or seller where the product is harmless to normal persons and the injury from the use of the product is attributable exclusively to hypersensitiveness or allergy. 2 R.D. Hursh & H.J. Bailey, American Law of Products Liability, § 12:4 (2d ed. 1974). However, this rule includes a caveat that there must be an absence of knowledge on the part of the manufacturer or seller that some people might be injured by the use of the product. Id. Stated another way, if the particular injury is reasonably foreseeable, however rare, the manufacturer or seller has the duty to warn. Billiar v. Minnesota Mining & Manufacturing Company, 623 F.2d 240, 246 (2nd Cir.1980); and Ferebee v. Chevron Chemical Company, 552 F. Supp. 1293 (D.D.C. 1982).
A manufacturer has the duty to possess expert knowledge in the field of its product. Tucson Industries, Incorporated v. Schwartz, 108 Ariz. 464, 501 P.2d 936 (1972). Dr. Williams testified that everyone would react to ammonia at sufficient concentrations and that significant quantities of ammonia gas can cause permanent irreversible damage  and in lower concentrations can cause reversible damage  to the lungs. Further, the amount of concentration that will cause problems in human beings is variable, as some people are more susceptible than others. When all of this evidence is considered, we think that Mrs. Harter produced sufficient evidence to create a jury question of whether Advance 480 was harmful to a reasonably foreseeable and appreciable class or number of potential users. We are not persuaded that it was error to submit the case to the jury simply because Mrs. Harter did not prove the exact concentration of ammonia required to produce injury to the ordinary person. Even the president of Advance did not know the safe level of ammonia. Dr. Williams' testimony concerning the amount sufficient to cause problems in a person with reactive airways disease  a not uncommon condition  indicates the difficulty of specifying an exact quantity. His testimony that "everyone is allergic to ammonia" would tend to justify a conclusion that a sufficient number of people would be affected by the product to require additional warnings as to its use which were not given here. We are also not persuaded that as a matter of law the result should be different simply because no one had ever complained to Advance about this product prior to Mrs. Harter's injury. Lack of notice of injuries does not establish the fact that no injuries had occurred. Schwartz, 501 P.2d at 940. As stated earlier, if the injury is reasonably foreseeable, even if rare, the seller cannot rely on its history of good fortune to exempt itself from liability. Billiar, 623 F.2d at 246; Ferebee, 552 F. Supp. at 1298; and Schwartz, 501 P.2d at 940.
A number of cases do apply the rule that there is no duty to warn where there is only a slight possibility of injury to a few persons, as where the product may affect allergic users but an allergy is not common to a substantial number of people. We note with considerable interest that these cases usually involve products intended for personal hygiene or other personal use such as body cleansers, hair soaps and dye, tooth paste, and other beauty products. 2 R.D. Hursh & H.J. Bailey, American Law of Products Liability, § 12:4 (2d ed. 1974); Annot., Seller's or Manufacturer's Liability for Injuries as effected by Buyer's or User's Allergy or Unusual Susceptibility to Injury from Article, 26 A.L.R.2d 963 (1952). For example, in the Grau case, relied upon by Advance, the plaintiff suffered injury after using Crest tooth paste. The injury resulted from the plaintiff's allergic reaction to the stanis flouride in the tooth paste, an allergy which was not common to a substantial number of possible *449 users. Stanis flouride is not dangerous to people who are not allergic to it. Accordingly, the court in Grau concluded that it was difficult to conceive of any warning which could have afforded any probability of preventing the plaintiff's injury. Grau, 324 F.2d at 310.
Here, on the other hand, there was evidence that ammonia can be dangerous to everyone given sufficient concentration. The comparison between the use of ammonia in Advance 480 and the use of stanis flouride in Crest tooth paste is therefore strained.
In sum, we find that the proof was sufficient to submit to the jury the question of whether Advance knew or should have known that use of its product could cause lung damage to its users. The evidence presented before the jury was sufficient to cause reasonable minds to differ as to the dangerous propensities of Advance 480 and the sufficiency of the notice supplied by the warning label. This being the case, the issues were properly submitted to the jury. Harless, 594 F.2d at 1059.
Advance's remaining points are without merit. Accordingly, the judgment below is AFFIRMED.
MILLS and THOMPSON, JJ., concur.