621 So.2d 1373 (1993)
SQUARE D Company, a Delaware Corporation, Appellant,
v.
George W. Hayson and Louise Hayson, Appellees.
Nos. 91-3805, 92-1457.
District Court of Appeal of Florida, First District.
July 2, 1993.
*1374 Julius F. Parker, Jr. of Parker, Skelding, Labasky & Corry, Tallahassee, Bruce M. Allman and Laurie J. Nicholson of Thompson, Hine and Flory, Dayton, Ohio, for appellant.
Robert L. Hinkle of Aurell, Radey, Hinkle, Thomas & Beranek, Tallahassee; C. David Fonvielle of Fonvielle & Hinkle, Tallahassee, for appellees.
SMITH, Judge.
In this consolidated appeal, Square D seeks reversal of a final judgment awarding damages to the Haysons in their products liability suit. Square D also seeks reversal of the trial court's order denying Square D's motion for post-verdict juror interviews. We agree with the trial court that the facts alleged in Square D's motion failed to state legally sufficient reasons to interview the jurors, and we affirm without further comment the appeal in Case No. 92-1457. Baptist Hospital of Miami, Inc. v. Maler, 579 So.2d 97 (Fla. 1991); Raybun and Partners v. Ashoka Enterprises, 604 So.2d 1284 (Fla. 5th DCA 1992); Orange County v. Piper, 585 So.2d 1182 (Fla. 5th DCA 1991); and Phares v. Froehlich, 582 So.2d 683 (Fla. 2d DCA 1991). After a thorough review of the facts and applicable law, we likewise affirm the judgment for the Haysons finding that the court properly submitted the negligence issues to the jury.
Square D is a large electrical equipment manufacturing company. Lewis & Thompson, an electrical contractor and George Hayson's employer, was engaged to do the electrical work on the Florida lottery building. In furtherance of this project, Lewis & Thompson purchased from Square D, through a distributor, an end tap box, busway and fusible disconnect switches, among other things.
The end tap box is a rectangular box roughly equivalent in size to two large suitcases stacked flat, one on top of the other. The busway is a combination of sections, each up to 10 feet tall and weighing 250 pounds. Each fusible disconnect switch is designed to be mounted on factory-cut notches located on the busway. In the lottery building, these busway sections were connected on top of each other to form a 48-foot tall structure. The combined 48-foot busway was mounted to the top of the end tap box and ran vertically through all four floors.
The busway system, properly installed, is designed to distribute electricity throughout the building. In operation, the end tap box takes electricity from a source and conveys it to the busway. The busway in turn makes electricity available on each floor of the building. Access to the electricity conveyed by the busway is available by mounting one or more fusible disconnect switches to the busway on each floor. A transformer is wired to the disconnect switch, making usable electricity available on each floor.
The busway manufactured by Square D is designed for use either vertically or horizontally. In the lottery building, the busway was installed vertically. On each segment of the busway appears the word "TOP," which indicates which side of the busway must be on top when the busway is installed horizontally. When the busway is installed vertically, it is mandatory that the word "TOP" be placed on the right side of the busway, a requirement which, it will be seen, could produce disastrous consequences if overlooked. The installation instructions for the busway contain the caveat that when the busway is mounted vertically, it must be positioned so that the "TOP" marking is to the right, and the neutral position is to the left. If placed so that the word "TOP" is on the left, the *1375 busway is backwards and dangerous when charged with electric current. While the installation instructions contain the caveat about proper alignment of the busway when placed vertically, there is no instruction or marking on the busway itself warning the installer that the word "TOP" should be on the right, and there is no indication on the equipment itself, either on the end tap box or busway, advising the installer of the proper orientation. Of further importance is the fact that the installation instructions were not shipped with the end tap box or busway, and no instructions shipped with these pieces contain the above-mentioned caveat. Square D did provide these installation instructions or "shop drawings" to Lewis & Thompson, but they were apparently in a trailer on the job site.[1]
When the busway is properly installed vertically  with the label "TOP" on the right  the fusible disconnect switch can be mounted right side up on the busway. Mounted right side up, the fusible disconnect switch works as intended. When the busway is installed backwards (as occurred in this case), with the label "TOP" on the left, the fusible disconnect switch will fit on the front of the busway upside down. There is no label on the 100-amp fusible disconnect switch indicating which orientation is upside down and which is right side up, or the proper orientation of the busway.
When the 100-amp fusible disconnect switch is installed upside down  the only way in which it can be installed on the front of a backwards-installed busway  an extremely dangerous condition results. In this orientation, the "neutral" position on the switch is not neutral, but is instead "hot," carrying 277 volts of electricity. When the switch is turned off  which should make it safe to work in the box  the "neutral" position remains electrically charged.
In the process of installing the electrical equipment in the lottery building, unidentified Lewis & Thompson employees improperly connected the busway riser to the end tap box so that the word "TOP" was on the left, instead of the right. On the basement floor of the building another worker, also unidentified, installed the 100-amp fusible disconnect switch upside down  which was the only way it could be mounted on the backwards busway.
On December 30, 1987, George Hayson was asked to work on the fusible disconnect switch on the basement floor. He noticed that something seemed wrong with the switch because the load and line sides were swapped. He turned the switch off and checked the switch phases for the presence of current and found none. He did not check the neutral, however, which he assumed to be, but which was not, uncharged.[2] When Hayson began to wire the neutral, using a metal wrench, an electric arc formed and electricity passed through Hayson's arm and out his back. As a result, Hayson suffered injury to his arm and subsequent brain damage. Although he returned to work for Lewis & Thompson, his return to employment was temporary. Shortly thereafter, he left his employment and has not been able to hold steady employment since.
A week after Hayson's accident, a Square D representative inspected the work site where Hayson was injured. He discovered that on two floors above where Hayson had been working, Square D's *1376 equipment had been modified. New notches had been cut on the busway riser to allow the disconnect switches to be installed right side up rather than upside down. In this orientation, the neutral position was neutral and the switch worked properly.[3]
It is not clear from the evidence whether these modifications at the other floor levels were done before or after Hayson's accident. It is clear, however, that these notches were cut only in the sections of the busway on the building's third and fourth levels, and not on the floor where Hayson was working. Hayson testified without contradiction that he had no knowledge of the modification of the busway sections on the third and fourth levels. No modification had been made to the end tap box or the busway section on the floor where Hayson was working and was injured. Also, the disconnect switch had not been modified. Although there was no ground stab on the switch when he was working on it, the missing ground stab would not have prevented mounting the switch exactly as it was mounted. Further, the evidence established that the modifications on the third and fourth floor levels simply permitted power to be drawn through the switches on those levels, and these modifications did not cause or contribute to the conditions which resulted in Hayson's accident.
The Haysons' complaint against Square D initially sought recovery on theories of strict liability and negligence. Later, the strict liability count was voluntarily dismissed. At the trial, the Haysons called witnesses including a mechanical engineer, who was permitted to testify over objection that the busway system was negligently designed and was defective. Regarding the absence of warning labels on the equipment, there was evidence of the ease of labeling, and that General Electric, a competing manufacturer, has already adopted such labeling. There was also evidence that the end tap box and busway could be designed in a manner or "keyed" so that the products could fit together only in the proper orientation. This is already being done by two other Square D competitors  Siemens I.T.E. and Westinghouse. The Haysons' expert electrical engineer testified that labeling the busway in a manner showing the proper orientation for horizontal installation only, with no labeling showing the proper orientation for vertical installation, did not meet reasonable electrical engineering standards.
The trial court denied Square D's motions for directed verdict and submitted the case to the jury on the Haysons' claim for negligence. The court gave the Florida Standard Jury Instructions for negligence. Square D requested two additional instructions on modification and deliberate misuse of a product. The Haysons contended below and contend on appeal, that Square D's proposed instructions were wrong and the trial court correctly refused to give the requested instructions. We agree. Sears, Roebuck & Co. v. McKenzie, 502 So.2d 940 (Fla. 3d DCA), rev. denied, 511 So.2d 299 (Fla. 1987) (to demonstrate reversible error, defendant must establish that the requested instructions contain an accurate statement of the law). Square D's misuse instruction asserted that misuse by anyone, whether foreseeable or not, precludes recovery by a plaintiff. This is clearly not the law, as will be more fully developed below. Similarly, Square D's modification instruction would have allowed the jury to exonerate Square D based on substantial changes that were not "expected," even if they were foreseeable, which also is contrary to the law as will be more fully developed below.
The jury returned a verdict finding negligence on the part of both Square D and Hayson, and apportioning fault between them 55% to Square D and 45% to Hayson. Based upon the jury verdict, the trial court entered final judgment for the Haysons awarding them damages in the amount of $400,125. The trial court denied Square D's motion for new trial.
*1377 On appeal, Square D contends that despite sufficient instructions on installation of the electrical system provided to them, an employee or employees of Lewis & Thompson installed the busway riser onto the end tap box incorrectly, which set into motion the chain of events which led to Mr. Hayson's injury. Square D argues that these employees either disregarded or failed to read Square D's instructions, and made the mistake in installation. It is Square D's position that Lewis & Thompson employees must have discovered this mistake, because modifications were made to the busway riser on the third and fourth levels, making it possible to operate the system on those floors. Square D contends it is not liable for the knowing and conscious misuse and/or modification of its products in a manner not intended by it. Clark v. Boeing Co., 395 So.2d 1226 (Fla. 3d DCA 1981) (flight attendant could not recover from manufacturer for negligent design where, although aware of the danger, she nevertheless opened airplane door (upon insistence of pilot) and was exposed to jet fuel and noise). Alternatively, Square D contends that once Lewis & Thompson employees knew of the dangerous condition (when they made the modifications on the third and fourth levels), that it became the duty of those employees to warn or prevent injury to employees working on other floors, which they did not do. Their intervening failure to act, Square D maintains, broke the chain of causation between any alleged design defect and the subsequent accident and became the sole proximate cause of injury to Hayson.
We find these arguments unpersuasive for several reasons. Square D makes the unwarranted assumption that its delivery of the shop drawings to the supervisory personnel of Lewis & Thompson was sufficient warning to the Lewis & Thompson employees of the exact manner in which the busway should be oriented when vertically installed. While it is true that in cases involving premises liability, an owner/contractee may not have a duty to warn the employees of an independent contractor where the contractor's supervisory personnel are aware of the danger, Horton v. Gulf Power Co., 401 So.2d 1384 (Fla. 1st DCA 1981),[4] the Florida rule is somewhat different in products liability cases. When the manufacturer of an article involving an inherently dangerous instrumentality (which includes electricity) places that product in the stream of commerce, the manufacturer assumes the duty of conveying to those who might use the product a fair and adequate warning of its dangerous potentialities. Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla. 1958). Comment n to § 388 of the Restatement (Second) of Torts states in pertinent part as follows:
[W]hile it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing. It may well be that he should take the risk that this information may not be communicated... . [I]f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the *1378 ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.
Florida has adopted section 388. Sowell v. American Cyanamid Co., 888 F.2d 802, 804 (11th Cir.1989), citing Tampa Drug Co. v. Wait.
In Sowell, a government employee injured while welding a sulfuric acid tank brought a products liability action against the tank's manufacturer, among others. In reinstating a jury verdict for the plaintiff, the court said:
Here, the basic issue is whether the corporate defendants discharged their duty to warn the plaintiff. Even though Converse [the designer of the tank] supplied a manual to the Navy regarding the dangers posed by the use of the product, "[t]he determination of whether [that] method ... [of warning was] sufficient [depends] upon a balancing of considerations, [including], among other factors, the dangerous nature of the product, the form in which it is used, the intensity and form of the warnings given, the burdens to be imposed by requiring warnings, and the likelihood that the particular warning will be adequately communicated to those who will foreseeably use the product." Doughterty v. Hooker Chemical Corp., 540 F.2d 174, 179 (3d Cir. 1976), citing, among other cases, Tampa Drug Company, supra. As Dougherty holds, "the determination as to whether [these duties have] been reasonably discharged comes within the function of the trier of fact." 540 F.2d at 179.
As in this case, the plaintiff in Sowell presented expert testimony that because of the dangerous potentialities of the product, a visual and dramatic warning should have been placed upon the product by the corporate defendants. Additionally, there was evidence that although Converse had supplied a manual to the Navy, this did not meet Converse's duty to adequately warn ultimate users. The court ruled that this testimony presented an issue of fact for the jury as to whether Converse had complied with its duty to warn. Similarly, it is our view that the evidence in this case presented a jury question on whether Square D complied with its duty to adequately label its products (the end tap box, the busway riser sections, and the 100-amp. fusible disconnect switches), showing the proper orientation for vertical installation of the busway riser, and adequately warning of the dangers of misinstallation.
Regarding Square D's contention that Lewis & Thompson employees' discovery of the backwards busway (evidenced by their modification to the busway on the third and fourth levels), and their subsequent failure to act to avoid injury constituted an intervening superceding cause of Hayson's injuries, the Haysons presented testimony that the modifications were made after the injury, not before. But even if the modifications were made before the injury, this would present at most an issue of intervening cause to be resolved by the jury. Kowkabany v. Home Depot, Inc., 606 So.2d 716 (Fla. 1st DCA 1992) (independent intervening cause should only be found where the circumstances are highly unusual, extraordinary, bizarre or, beyond the scope of any fair assessment of danger created by the defendant's negligence).
A negligent party is not absolved of liability by the subsequent act of negligence by a third party, if that third party's negligence is itself foreseeable. Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520 (Fla. 1980). The Haysons presented testimony from which a jury could find that given the inadequate design and labeling of the busway riser, it was only a matter of time until a busway was installed backwards and someone was injured as a result. As even Square D has admitted, Hayson's injury could occur in the absence of the modifications on the third and fourth levels, and the jury could reasonably conclude that the modifications did not contribute to Hayson's injury. See e.g. Martinez v. Clark Equipment Co., 382 So.2d 878, 880 (Fla. 3d DCA 1980) (changes in the product, which are not involved in the accident, do not absolve the manufacturer of liability).
*1379 This court's recent decision in Hyster Co. v. Stephens, 560 So.2d 1334 (Fla. 1st DCA 1990) provides additional guidance. Hyster held that whether an alleged design defect in a forklift transmission  which allegedly permitted the forklift to unexpectedly jump into gear  was the proximate cause of injuries to a worker struck by the forklift, was a question for the jury. In that case, as here, there was evidence of a coworker's alleged intervening negligence (the coworker left the forklift unattended without turning off the engine or lowering the lift to act as a brake).
One final point must be addressed. Square D urges that the trial court erred in permitting Hayson's expert witness, a mechanical engineer, to testify that the busway system was negligently designed and defective. The witness had no training in the area of labels and warnings, and had never been qualified as an expert in electrical power distribution equipment. The Haysons respond, on the other hand, that the witness holds a Ph.D. in mechanical engineering, heads his own engineering firm, holds over 40 patents, and has participated in designing over 40 machine systems and products. This expert witness also frequently performs a "failure mode and effects analysis" or "FEMA," which determines the ways in which a product may fail or be misused and the consequences if it does, to "design-out" any significant problems if possible, and to develop adequate instructions or warnings to avoid any problems that cannot be feasibly designed out.
As the Haysons' expert pointed out, the busway is a mechanical structure which transmits electricity. Even though the witness had only elementary knowledge of the principles of electricity, expert knowledge of the electricity transmitted within the busway was not necessary to do a "FEMA" analysis of the product. He opined that a proper "FEMA" would have disclosed the problem that occurred in this case. Under the circumstances we agree the trial court did not commit error in permitting his testimony. See Criger v. Webster Elec. Co-op, 783 S.W.2d 941 (Mo. App. 1990) (witness who held doctor's degree in electrical engineering was properly permitted to testify that eye pin of the insulator had separated from the porcelain bell, causing power line to sag, even though he was not expert in ceramics, where he testified that, in analyzing the insulator, it was not necessary to know anything about ceramics, and he had academic training and experience with the principles of physics which had to be applied).
Finally, Square D maintains that the Haysons' expert was impermissibly allowed to testify that the labeling on Square D's busway product did not comply with UL (Underwriters Laboratories) standards. We disagree. This case was of a sufficiently technical nature that expert testimony could be expected to assist the jury in deciding the case, and the witness explained the basis of his opinion in sufficient detail to permit the jury to independently evaluate his conclusions. Moreover, Square D's expert witness opined on the same subject, and contrary to the Haysons' expert, that Square D's labeling complied with UL standards. The trial court instructed the jury that it was free to disregard expert opinion. Given all these circumstances, it is our view that the trial court did not abuse its discretion in permitting the witness to give the brief testimony that Square D's labeling did not meet UL standards, and even if error, viewed in the light of all the evidence, the error does not warrant reversal.
AFFIRMED.
BOOTH and MINER, JJ., concur.
NOTES
[1] It should be noted also that the booklet shipped with the end tap box provides in part V, "STEPS TO BE TAKEN BEFORE ENERGIZING," that the installer should verify that the system phasing matches the busway phasing before reconnecting all connections to transformers, switchboards, meters, etc. However, even Square D's expert recognized that the installer must know the correct position of the marking "TOP" before he can adequately check phasing. Nothing in the above-mentioned booklet told the installer where the marking "TOP" was supposed to be. The busway instructions which came with the busway did advise: "Orient busway straight links with "TOP" sides facing same way." In this case, the marking "TOP" did face the same way all the way up the busway. Critically, the marking "TOP" was on the left side, rather than the right side.
[2] Whether it was reasonable on Hayson's part not to check the neutral line under these circumstances was the subject of conflicting evidence.
[3] Later, it was determined that the best way to alleviate the danger posed by the backwards busway was to rotate the busway to the proper position  which was done on all four floors of the building.
[4] Compare Crawford v. Florida Steel Corp., 478 So.2d 855, 861 (Fla. 1st DCA 1985) (notice to the independent contractor or its supervisory personnel of the hazards within the employment area is notice to the independent contractor's employees only where the employer of the independent contractor is not in immediate control of the employment area and does not participate in the operation thereon).