PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

DONNA VAUGHN,
Plaintiff-Appellant,

v.

No. 95-1086

NISSAN MOTOR CORPORATION IN
U.S.A., INC.,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Beaufort.
Cameron McGowan Currie, District Judge.
(CA-92-1764)

Argued: December 8, 1995

Decided: March 5, 1996

Before RUSSELL and HALL, Circuit Judges, and THORNBURG,
United States District Judge for the Western District
of North Carolina, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Hall wrote the
opinion, in which Judge Russell and Judge Thornburg joined.

_____

COUNSEL

**ARGUED:** James B. Richardson, Jr., SVALINA, RICHARDSON &
SMITH, Columbia, South Carolina, for Appellant. Joel Haywood
Smith, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P.,
Columbia, South Carolina, for Appellee. **ON BRIEF:** Samuel L.

Svalina, SVALINA, RICHARDSON & SMITH, Columbia, South Carolina, for Appellant. Stephen G. Morrison, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellee.

_____

## OPINION

HALL, Circuit Judge:

In this products liability suit, Donna Vaughn appeals a judgment entered on a jury verdict in favor of defendant Nissan Motor Corporation in U.S.A. (Nissan). Because a jury instruction on a key issue was erroneous, and we cannot say that the error was harmless, we vacate the judgment and remand for a new trial.

I.

This suit was filed in state court in Beaufort County, South Carolina. It was removed to district court by Nissan; jurisdiction rests on diversity of citizenship.

Here are the facts as presented at the jury trial. On May 5, 1991, Donna Vaughn was driving her 1989 Nissan Pulsar on Interstate 95 in Colleton County, South Carolina. The voltage regulator failed, which in turn caused excessive current, which in turn caused the battery fluid to boil.

According to Vaughn, toxic fumes (chiefly various compounds of sulfur) entered the passenger compartment through the car's ventilation system. She inhaled these fumes, and, as a result, now suffers from vocal chord dysfunction and reactive airway dysfunction syndrome (RADS), a severe form of asthma.

Two experts testified for Vaughn that the voltage regulator was of inferior design and contained construction defects that caused the malfunction. Nissan did not directly challenge this testimony. Its expert attempted to show that the regulator's failure did not create a condition unreasonably dangerous to an ordinary consumer. He con-

2

ducted a road test experiment that purportedly duplicated the incident. He concluded from his experiment that the fumes, though toxic at their point of release, did not enter the passenger compartment in harmful concentrations, and that the overheating occurred slowly enough to give the driver ample warning of a problem and hence ample opportunity to flee the vehicle. On the other hand, the test driver's eyes became irritated, he coughed, and he smelled a "rotten egg" odor. Moreover, at the very same time the driver experienced this discomfort, Nissan's test meter detected no hydrogen sulfide.

The wrecker driver who came to the scene of Vaughn's mishap testified that a foul odor was obvious at a distance of five to ten feet from the car, and he held his breath while inside the car to release the brake for towing. Even the next day, when he was trying to start the car, the same witness found the fumes to be "extremely strong," causing his eyes to burn and water.

Four physicians, including Vaughn's treating physician, testified that she had developed RADS as a direct result of inhaling the sulfur-laden fumes. On the other hand, the district court refused to permit these physicians to testify that Vaughn's alleged vocal chord dysfunction was also caused by the incident. According to the court, this proffered testimony was not sufficiently grounded in scientific knowledge to be admissible under the test announced in Daubert v. Merrill Dow Pharmaceuticals, Inc., 113 S.Ct. 2786 (1993).

Nissan presented evidence that Vaughn suffers from somatization disorder, which dates from abuse she experienced as a very small child. A person with somatization disorder exhibits illnesses that have no apparent physiological cause. Nissan's experts testified that Vaughn does not have RADS, but does have vocal chord dysfunction (which mimics and is often misdiagnosed as asthma). Finally, while vocal chord dysfunction has no known physiological cause, a Nissan expert testified that it is consistent with somatization disorder.[1]

_____

[1] This particular opinion was something of a tautology, inasmuch as every physical complaint that lacks a known physiological cause is "consistent" with a disorder that is characterized by the exhibition of illnesses with no known physiological cause.

The district court denied Vaughn's motion for a partial directed verdict, and gave a key instruction to which she excepted. The jury returned a verdict for Nissan. Vaughn's motion for a new trial was denied, and she appeals.

II.

This action is based on S.C. Code Ann. § 15-73-10,[2] which adopts the formula of Restatement (Second) of Torts § 402A for imposing strict liability on the seller of a defective product.[3] Not every "defect," as the term is commonly used, subjects a seller to strict liability. The "defect" must cause the product to be unreasonably dangerous. A car with a bad radio is not unreasonably dangerous; a car with bad brakes may be. Moreover, whether the defect causes the product to be "unreasonably dangerous" is measured by the "ordinary consumer" for whom the product is designed. Id., comment i.[4] A circular saw would

_____

[2] Vaughn also alleged a claim for breach of warranty, which, in this context, has the same elements as her strict liability claim. See, Bragg v. Hi-Ranger, Inc., 462 S.E.2d 321, 326 (S.C.App. 1995) (listing essential elements of "any products liability theory"). Consequently, no separate discussion of Vaughn's warranty claim is necessary.

[3] The statute reads:

> § 15-73-10. Liability of seller for defective product.
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if
>
> (a) The seller is engaged in the business of selling such a product, and
>
> (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in subsection (1) shall apply although
>
> (a) The seller has exercised all possible care in the preparation and sale of his product, and
>
> (b) The user or consumer has not bought the product from or entered into any contractual relation with the seller.

[4] The comments to § 402A of the Restatement were explicitly adopted as the legislative intent of its South Carolina analogue. S.C. Code Ann. § 15-73-30.

4

be quite dangerous if used by a blind man, but a properly designed and manufactured saw is safe and useful to an ordinary person. Consequently, circular saws are not per se defective, notwithstanding a fingerless blind man here and there.

On the other hand, if the saw is unreasonably dangerous to an ordinary consumer -- e.g., the blade flies off because of a manufacturing defect -- recovery is not restricted to "ordinary consumers" alone. See Purvis v. Consolidated Energy Products Co., 674 F.2d 217, 222 (4th Cir. 1982) (applying S.C. law) (commercial entity may maintain a strict liability action, because "[i]t is the nature of the risk that caused injury, rather than the nature of the parties, which is finally determinative"); Salt River Project Agr. Imp. and Power Dist. v. Westinghouse Electric Corp., 143 Ariz. 368, 694 P.2d 198, 211 (1984) (same); Todd v. Societe Bic, S.A., 21 F.3d 1402 (7th Cir.) (en banc) (in action arising from death of child, the product, rather than the plaintiff, was subjected to the "ordinary consumer" test), cert. denied, 115 S.Ct. 359 (1994).

This principle is analogous to the "thin skull" rule of negligence law. The tortfeasor's duty of care is measured by the ordinary person,[5] but the plaintiff's injuries may not be. In short, if Nissan breached its objective duty of care, it must take its victim as it finds her.

We do not mean to say that a plaintiff's extraordinary quality -- whether infancy, insanity, allergy, or commercial sophistication --

---

[5] In the products liability context, even that manufacturer whose product is safe for the "ordinary consumer" is not necessarily off the liability hook. Where the manufacturer is or should be aware that an appreciable number of consumers are unusually susceptible to injury from his product -- allergies are the classic example -- a duty to warn those consumers may arise. Restatement, § 402, comment j. See, e.g., Brown v. McDonald's Corp., 101 Ohio App.3d 294, 655 N.E.2d 440, 443-444 (1995); Advance Chemical Co. v. Harter, 478 So.2d 444, 447-448 (Fla.Dist.Ct.App. 1985). See generally, Annot., "Products Liability: Strict Liability in Tort Where Injury Results from Allergenic (Side-Effect) Reaction to Product," 53 A.L.R.3d 298 (1973 & Supp. 1994); annot., "Seller's or Manufacturer's Liability for Injuries as Affected by Buyer's or User's Allergy or Unusual Susceptibility to Injury from Article," 26 A.L.R.2d 963 (1952, 1981 (Later Case Service), & Supp. 1994).

has no role in the ultimate decision on liability. It certainly may, although its relevance is to questions such as proximate or intervening cause, or contributory or third-party negligence. It has no place in the purely objective determination of whether the product itself is unreasonably dangerous to an ordinary consumer. In a case similar to this one, the en banc Supreme Court of Washington had these observations:

> [Plaintiff] presented evidence that exposure to certain concentrations of formaldehyde is harmful to persons. Her doctors, moreover, unequivocally testified that she was harmed by the gas. The defense medical experts did not refute this evidence and in fact agreed a substantial portion of the population may suffer some reaction to formaldehyde. Rather, the defense experts testified [that plaintiff's] asthma was genetically, rather than chemically induced. This evidence goes to causation, however, not to whether the [product] was fit for the foreseeable "ordinary" consumer.

Tiderman v. Fleetwood Homes of Washington, 102 Wash.2d 334, 684 P.2d 1302, 1304-1305 (1984).

At the charge conference, the district court stated its belief that even if Vaughn's Nissan were in a defective condition unreasonably dangerous to an ordinary consumer, Vaughn could only recover if she too were an "ordinary consumer." Nissan had not requested such a jury charge, and Vaughn objected to it. Nonetheless, the erroneous instruction was given.[6]

_____

[6] With the portion to which Vaughn objected emphasized, the instruction read:

> [I]f you find that she has asthma, then you must consider whether her asthma was proximately caused by inhalation of toxic fumes from the battery of the Nissan Pulsar. If you find that the battery, the alternator/regulator, excuse me, was in a defective condition unreasonably dangerous to the ordinary consumer, and if you find that Donna Vaughn was an ordinary consumer, and if you find that she was injured as a result of that accident, and if you find that her injury was asthma, then you

6

Nissan took full advantage of the error in final argument, emphasizing that Vaughn has severe psychological problems and that those problems bar recovery. (E.g., "Have they proved that she is not psychologically ill, that she is an ordinary person?") Counsel for Nissan listed the spurious "element" on a blackboard in an apparent effort to impress it in the jurors' minds.

This faulty instruction requires reversal. It could very, very easily explain the verdict, because the evidence on this point was perhaps the most clear-cut in Nissan's favor of any issue that went to the jury. Vaughn concedes that she has a history of psychiatric illness from which she has never completely recovered.

Nissan virtually admits that the instruction is erroneous. It lamely points out that "ordinary consumer" was used several other times in the instructions without objection, to which Vaughn aptly replies that the term was not objectionable elsewhere. Moreover, these correct usages did not cure or dissipate the harm of the erroneous instruction.[7] We must therefore grant a new trial.

_____

would have determined that her asthma was proximately caused by the inhalation of toxic fumes.

As we stated above, the plaintiff's extraordinary quality or qualities can come into play on a causation issue, and this instruction does generally cover proximate causation. However, it errs because it requires the jury to find for Nissan simply because Vaughn has an unusual quality, rather than because the unusual quality, instead of the product defect, was the proximate cause of the injury.

[7] Jury instructions are a human endeavor, so we cannot demand that they be perfect. Hence, we do not parse a jury charge sentence-by-sentence in search of inartful language or trivial ambiguity, and we ignore such minor irregularities where the charge as a whole adequately and accurately states the law. Here, the error is patent, its expression is clear, and language even arguably mitigating it is absent. The charge as a whole thus contained the error as starkly as did the faulty single instruction.

III.

Vaughn also challenges two rulings made in the course of trial: (i) the district court's exclusion of her experts' testimony that exposure to the fumes caused her vocal chord dysfunction, under the standard announced in Daubert, 113 S.Ct. at 2797; and (ii) the denial of her request for a partial directed verdict on the "defect" issue. Inasmuch as a new trial is required, and these issues may then arise on a much different record, if they arise at all, we decline to render an advisory opinion on them.

The judgment of the district court is vacated, and the case is remanded for a new trial.

VACATED AND REMANDED

8