501 P.2d 936

**TUCSON INDUSTRIES, INCORPORATED, an Arizona corporation, Wilhold Glues, Inc., a California corporation, Walter N. Boysen Co. of Southern California, a California corporation, Entz-White Lumber and Supply, Inc., an Arizona corporation, Ann Chamberlin and William George Bolon, Appellants,**

v.

**Helen SCHWARTZ and Jack Schwartz, her husband, Appellees.**

**No. 10731–PR.**

Supreme Court of Arizona, In Banc.

Oct. 11, 1972.

Rehearing Denied Nov. 14, 1972.

Snell & Wilmer by Arthur P. Greenfield, Phoenix, for appellants Wilhold Glues, Inc., Walter N. Boysen Co. of Southern Cal. and Entz-White Lumber and Supply, Inc.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Richard J. Woods, Phoenix, for appellants Tucson Industries, Chamberlin and Bolon.

Langerman, Begam & Lewis, P.A. by Robert G. Begam, Phoenix, for appellees.

HAYS, Chief Justice.

Helen Schwartz, hereinafter referred to as plaintiff, sued Wilhold Glues, Inc., Walter N. Boysen Company, Entz-White Lumber and Supply, Inc., Tucson Industries, Inc., Ann Chamberlin, and William Bolon, for convenience hereinafter referred to as Wilhold, Boysen, White, Tucson Industries, Chamberlin, and Bolon, respectively. Plaintiff recovered a $75,000 judgment against all six defendants and all appealed. The Court of Appeals affirmed as to the first three, and reversed and remanded as to the last three. Its decision is reported at 15 Ariz.App. 166, 487 P.2d 12. Petitions for review were filed by plaintiff and by the first three defendants, and were granted.

The decision of the Court of Appeals is vacated.

The building at 908 East Camelback Road in Phoenix was occupied by Frontier Carpets, plaintiff's employer, and by Wig World, a business owned by Tucson Industries. The latter occupies the major portion of the building. Both Frontier and the Wig World are air-conditioned by a system wherein both spaces have a common return air duct. Chamberlin and Bolon are employees of the Wig World.

In April, 1964, the Wig World was remodeling. This work included, among other things, interior painting and affixing Formica to various counters and fixtures.

Defendant Wilhold manufactures and markets a product called Contax Cement. One of its jobbers is Boysen. One of Boysen's retailers is White. Bolon bought some Contax Cement from Entz-White to

glue the Formica to the fixtures in the Wig World. The remodeling took several weeks.

From April, 1964, plaintiff began to notice paint odors at work. On April 13 she became aware of a new and stronger smell emanating from the adjacent Wig World, which made her cough. On April 16 the smell was very strong, causing eye-watering and more coughing. At the end of the day when she went home she felt light-headed and groggy. The next morning, although the air conditioner was on in her office, the smell seemed about the same. At about 1:30 P.M. Chamberlin turned on the air conditioner in the Wig World, and suddenly it seemed as if "a bomb full of fumes" had been dropped in plaintiff's office. She obtained permission to go home. Her eyes were watering and her chest felt "heavy."

The next day her doctor hospitalized her with a diagnosis of "chemical keratitis." The outer layer of the cornea of each eye was blistered and loose. The doctor removed the damaged portions, expecting the tissue to regenerate in a few days. Instead, her condition grew progressively worse. She developed glaucoma and underwent two operations to relieve that condition. Later she developed cataracts which will require more surgery. Because of the fact that her eyes are damaged, the prognosis for success of further surgery is "guarded" and she has a 40% chance of becoming totally blind.

Her action was brought on four theories: negligence, nuisance, breach of warranty, and strict liability. The trial court refused to submit to the jury the issues of contributory negligence and assumption of risk.

The Court of Appeals affirmed the judgment against Wilhold, Boysen and White, but reversed as to the other three defendants, and remanded for a new trial as to them in which the issues of contributory negligence and assumption of risk would be submitted to the jury. The last three defendants did not petition for review.

We shall discuss the issues in two parts. First, with reference to Wilhold, Boysen and White; and second, with reference to Tucson Industries and its two employees, Chamberlin and Bolon.

I

Strict liability is not a new concept—it dates back to the famous case of Rylands v. Fletcher, an English decision of the House of Lords, L.R. 3 H.L. 330 (1868). That case involved damage caused by a man's erecting on his own property, a large reservoir of water which broke and caused flood damage to his neighbors. For years, the Rylands v. Fletcher doctrine was limited and the courts refused to extend it to products, on the ground of lack of privity. Winterbottom v. Wright, 10 M. & W. 109, 152 English Reports 402 (Exch.1842). Gradually the doctrine was extended to products termed "inherently dangerous." Thomas v. Winchester, 6 N.Y. 397 (1852); MacPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050 (1916). Following these older cases, came Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962); and Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964).

These last three cases so broadened the rule that by 1964 the American Law Institute's Restatement (Second) of Torts § 402A, codified the then status of strict liability as follows:

> "402A. Special Liability of Seller of Product for Physical Harm to User or Consumer
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial

;change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Caveat:

The Institute expresses no opinion as to whether the rules stated in this Section may not apply

(1) to harm to persons other than users or consumers. . . ."

This court was already thinking along the same lines. *See* Colvin v. Superior Equipment Co., 96 Ariz. 113, 118–119, 392 P.2d 778 (1964); Nalbandian v. Byron Jackson Pumps, Inc., 97 Ariz. 280, 287–288, 399 P.2d 681 (1965). In 1968, we eliminated the Restatement's caveat by permitting a nonuser (a passenger in a motorboat) to recover. O. S. Stapley Co. v. Miller, 103 Ariz. 556, 447 P.2d 248. In that case, we quoted Comment (c) of the Restatement, *supra*, a part of which reads as follows:

"c. On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

Our Court of Appeals, in Caruth v. Mariani, 11 Ariz.App. 188, 463 P.2d 83, explained Stapley, *supra,* saying:

"Strict tort liability is based on public policy. . . . Who should bear the loss? The injured member of the public or those persons who are in the chain of placing defective goods on the market? We choose to protect the member of the public since those involved in the chain of marketing can distribute the risk between themselves by means of insurance and indemnity agreements. . . ."

The rationale of the doctrine of strict liability is also expressed by the following quotation from Escola v. Coca-Cola Bottling Co. of Fresno, 24 Cal.2d 453, 150 P. 2d 436:

". . . Even if there is no negligence, however, public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot . . . . the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business."

The above statements explain why we separate the first three defendants from the last three—the first three are in the chain of distribution of the product—the Contax Cement. Strict liability is not a doctrine that may be extended to one not in the business. If a woman buys a can of beans which she does not know is poisonous, she will not be held liable on any theory of strict liability, to her dinner guests who are poisoned by the product. Strict liability is a public policy device to spread the

risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know-how to remove its defects before placing it in the chain of distribution.

■ Wilhold attempted to escape liability by the testimony of its secretary-treasurer, who stated that he had been with the company for 14 years; that the company had been making its Contax Cement for 15–20 years; that it sold some 40,000 gallons of it per month; and that during all of that time not one single report of eye injury had been received by his firm. This is, of course, material to an action bottomed on negligence, but immaterial to an action based upon strict liability. It should however be noted that even in a negligence case, the lack of notice of injuries (1) does not establish the fact that no injuries had occurred, and (2) a long history of good fortune does not exclude a conclusion that ordinary prudence requires a warning. 50 Federal Rules Decisions, 319, 334. Furthermore, a manufacturer has a duty to possess expert knowledge in the field of his product. *Ibid.* In La Plant v. E. I. Du Pont de Nemours & Co., 346 S.W.2d 231, 240 (Mo.App.1961) the court put it as follows:

"But in manufacturing and distributing chemical weed killers, Du Pont in that field is held to the skill of an expert, is charged with superior knowledge of the nature and qualities of its products, and is obligated reasonably to keep abreast of scientific information, discoveries, and advances with respect thereto."

■ However, strict liability applies only to products which are defective. A man who drinks too much whisky that he has purchased, cannot complain so long as the whisky was pure. A diabetic who uses too much sugar cannot sue if there is no impurity in the sugar. How, then, may the plaintiff in the instant case rely upon the rule of strict liability? Her claim is based upon the theory that the defect in the Contax Cement was the fact that its label contained an inadequate warning. There is law to support this position.

"No doubt he [the maker] must give what warning he can . . . no doubt a product sold without such warning is to be regarded as defective and will subject him to strict liability. . . ." Prosser, in 50 Minn.L.Rev. 791, 808.

"[A] product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning." Canifax v. Hercules Powder Co., 237 Cal.App.2d 44, 46 Cal.Rptr. 552, 558.

"As has been noted, the only warning on the box was, 'Caution: Inasmuch as the alkalinity of Bondex may be irritating to tender or sensitive skin, it is advisable to use a paddle for mixing, and to avoid excessive or prolonged contact with the skin.' We think a jury reasonably could have found that there was nothing in the foregoing language which would cause an ordinarily intelligent person to believe that the product Bondex was such that a small quantity of it lodged in an eye could cause almost immediate blindness. On the contrary, a jury reasonably could have found that the language used was in the nature of an assurance that the *only* danger in the use of Bondex was that it might have a slightly irritating effect upon a tender skin after prolonged contact." Haberly v. Reardon Co., 319 S.W.2d 859, 867 (Mo.S.Ct.)

■ The decisive issue here, then, is whether the warning on the cement was adequate. There were two, which read as follows:

"DANGER: Be sure all pilot flames are out as fumes travel on floor. Do not smoke. Do not take internally. EXTREMELY FLAMMABLE. Contains Butanone, Toluol and Hexane. Use with adequate ventilation. Keep container closed. VAPORS HARMFUL. TOXIC. Keep out of reach of children.

Avoid prolonged or repeated breathing or contact with skin."

"DANGER, extremely flammable, read the instructions, be sure to provide adequate ventilation and safety first."

The record shows that the "Merck Index" is widely used and accepted as an authoritative text on pharmaceuticals; that it describes Butanone as a solvent used in the surface-coating industry; that in the section relating to "human toxicity" it states that Butanone "may be irritating to eyes and mucous membranes."

It is our opinion that if the product used in this case was capable of causing blindness to a woman occupying a different room in the same building, then the above warning was inadequate, and the product was defective in that respect. An adequate warning would indicate that the product gave off fumes which could cause blindness to humans, even in rooms separated by a closed door, and that caution should be taken in making sure that the ventilation used to protect the user did not dissipate the fumes into other rooms of the same building.

■ There is also in the record, some evidence that plaintiff's keratitis might have been viral, rather than chemically caused by the fumes, since neither Bolon nor Chamberlin who worked in the same room with the cement suffered any ill effects. However, the timing throws doubt on that possibility, and the jury's verdict settles the causation, so that in this court we must proceed on the theory that plaintiff's injury was caused by fumes from the cement. Had there been an adequate warning on the can of cement, there would have been no defect, and the liability could not have been traced upwards past the persons applying it. Either those applying it would have prevented the injury to plaintiff in the building, or they, rather than the selling defendants, would be liable for negligently failing to heed the warning. Thus, we have, in the instant case, a classical situation for the application of the doctrine of strict liablity.

## II

■ With reference to Tucson Industries (Wig World) and Chamberlin and Bolon, liability must rest upon the negligence, if any, of the latter two employees. As far as Chamberlin goes, the only act which we can find in the record that could be negligence is her turning on of the air conditioner. In the absence of evidence that she knew the two shops shared a common return air duct, and the significance of that fact, negligence cannot be predicated on anything that she did.

■ Bolon's negligence was not proved sufficiently to justify its submission to the jury. He testified that each time he spread the cement on a surface, he re-covered the can, which was thus open for only about two minutes each time. He testified that he kept the doors and windows open in the room where he was working with the cement. Monte Meux, the then manager of Frontier Carpets where plaintiff worked, was a witness. He testified that upon plaintiff's complaint about the strong, irriating odor, he went into the room where she was working and turned off the air conditioner because it seemed as if that was the source of the fumes, and sent plaintiff home. He was also in and out of the Wig World nearly every day, watching the application of the Formica. He testified that he once saw Bolon spread the cement on three or four pieces of Formica at one time, before replacing the lid on the cement can. However, his memory was very vague, and at one time he stated that he did not know when the lid was replaced, or whether it was replaced, and almost immediately testified:

"Q. You are not telling the jury that he left the top off?

A. No Sir."

Upon this state of the record, a jury verdict against the three defendants, based on negligence on the part of Bolon, can not be allowed to stand.

The decision of the Court of Appeals is vacated.

The judgment against Wilhold, Boysen, and Entz-White is affirmed; the judgment against Tucson Industries, Chamberlin, and Bolon is reversed with directions to the trial court to dismiss the action as to them.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.