Amanullah KHAN, et al., Appellants,

v.

VELSICOL CHEMICAL CORPORATION, Appellee.

No. 05–84–00711–CV.

Court of Appeals of Texas, Dallas.

April 25, 1986.

Rehearing Denied June 9, 1986.

---

Joe N. Boudreaux, Joe Smith, Baker, Foreman & Boudreaux, Dallas, for appellants.

Dennis Weitzel, Ronald D. Wren, Stradley, Schmidt, Stephens & Wright, Dallas, for appellee.

Before GUITTARD, C.J., and STE-PHENS and STOREY [1], JJ.

ON MOTION FOR REHEARING

STOREY, Justice.

In this product-liability case, summary judgment was rendered for the manufacturer. Amanullah Khan and members of his family sued Miss Phoebe's Pest Control, Inc. and Velsicol Chemical Corporation for personal injuries and property damage resulting from Miss Phoebe's application to their home of a termiticide manufactured and supplied by Velsicol. The Khans' suit against Velsicol alleges strict liability in tort, breach of an implied warranty under sections 2.314 and 2.315 of the Texas Business and Commerce Code, breach of common law warranty, and violations of the Texas Deceptive Trade Practices Act. Velsicol moved for summary judgment asserting that, upon undisputed facts, it was entitled to judgment as a matter of law because: (1) Miss Phoebe, who treated the Khans' home for termites, was a "learned intermediary" between Velsicol and Khan, (2) Miss Phoebe's misuse of the termiticide was the sole producing cause of the injury, (3) Miss Phoebe was the Khans' agent, and (4) the Khans did not as a matter of law rely on any representation made by Velsicol. The trial court granted summary judgment in favor of Velsicol and severed the Khans' claim against Miss Phoebe. We reverse and remand.

### Facts

The material facts are undisputed. Velsicol manufactures and sells a termiticide known in the trade as Gold Crest C–100, an emulsifiable concentrate containing chlordane as its principal active ingredient. It is admittedly toxic—its purpose is to rid homes and other structures of termites and other insects. Therefore, it is inherently dangerous. Gold Crest C–100 is not unreasonably dangerous when properly put to its intended use. It is manufactured and sold by Velsicol in five-gallon containers to distributors who in turn sell to professional applicators such as Miss Phoebe for their use only. The label clearly instructs "FOR USE BY PROFESSIONAL PCO'S."

Miss Phoebe purchased the Gold Crest C–100 concentrate in a five-gallon container. In accordance with label instructions, one gallon of the concentrate was then mixed with 99 gallons of water to form a 1% solution. The solution was prepared at Miss Phoebe's offices in a one-hundred-gallon tank aboard a pick-up truck, then transported to the Khan home where it was applied directly from the tank by means of a low-pressure hose. The solution was prepared and applied by Miss Phoebe's service operator, John Long.

There is no claim that the particular lot or container of Gold Crest C–100 used in preparing the solution and in treating the Khans' home was defective. It was manufactured and marketed precisely as Velsicol intended. The "defect" making the product unreasonably dangerous, and thus giving rise to the Khans' action in strict liability, was Velsicol's alleged placing of the product into the stream of commerce without adequate warnings and instructions for its use. Specifically, the Khans complain that Velsicol failed to adequately warn or give instructions either to them or to Miss Phoebe concerning the very event that occurred at the Khan home: Miss Phoebe's service operator, Long, drilled a hole into the concrete slab foundation of the home, pierced an air-conditioning duct encased within the slab, and proceeded to induce an unknown quantity of Gold Crest C–100 into the duct.

### Duty to Warn and Instruct

Velsicol contends that because its product was purchased and used only by professional applicators trained in its use, it owed no duty to warn or instruct the Khans concerning its safe use, but instead its duty to warn was limited to Miss Phoebe, who

---

**1.** The Honorable Charles H. Storey, Justice, Court of Appeals, Fifth District of Texas at Dallas, retired, sitting by assignment.

had full knowledge of the danger and was fully instructed. Velsicol would have us apply the "learned intermediary" doctrine to the circumstances of this case.

■ The rationale supporting the learned intermediary exception to the manufacturer's duty to warn the consumer in products liability cases is well stated in *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974):

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.

The Texas Supreme Court has never explicitly approved the learned intermediary doctrine, although it has been approved by intermediate appellate courts in Texas. *See, e.g., Cooper v. Bowser,* 610 S.W.2d 825, 830–31 (Tex.Civ.App.—Tyler 1980, no writ); *Bristol-Myers Co. v. Gonzales,* 548 S.W.2d 416, 425 (Tex.Civ.App.—Corpus Christi 1977), *rev'd on other grounds,* 561 S.W.2d 801 (Tex.1978); *Gravis v. Parke-Davis & Co.,* 502 S.W. 863, 870 (Tex.Civ. App.—Corpus Christi 1973, writ ref'd n.r. e.). This doctrine has consistently been limited in its application in Texas and elsewhere to the prescription drug, physician-patient relationship. For these reasons, we are unwilling to extend the exception to the circumstances of this case. Additionally, we cannot attribute to the termiticide applicator the ability to exercise the individualized judgment in weighing benefit against danger that we ascribe to the physician. This is true because, as we observe later in this opinion, the termiticide applicator gains a substantial part of his expertise in the field from his manufacturer or supplier rather than from independent sources.

Closely akin to the learned intermediary exception, as it relates to the duty to warn

the ultimate consumer, is the rule applied in some jurisdictions to sellers of goods in bulk. Indeed, Velsicol interprets these authorities as applying the learned intermediary exception. However, the rationale supporting the bulk seller exception is different—it appears to be a question of feasibility and practicality. *Shell Oil Co. v. Harrison,* 425 So.2d 67, 70 (Fla.Dist.Ct. App.1982, pet. for rev. denied); *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383, 1394 (1976); *see also Alm v. Aluminum Co. of America,* 687 S.W.2d 374, 382 (Tex.App.—Houston [14th Dist.] 1985, writ granted). These authorities, for example, seem to base their holdings on the proposition that the bulk seller has no means of identifying or communicating with the ultimate consumer. Hence, these authorities hold that the bulk seller has no duty to warn the ultimate consumer, but only to warn the distributor or retailer.

In *Shell Oil Co.,* Shell, the manufacturer, sold its fungicide to Kerr-McGee in 30-gallon steel containers. Kerr-McGee then sold the product to its distributors, who sold it to retailers, who finally sold it to the consumer in one-gallon glass jars. Noting that warnings from Shell to the consumer were "unfeasible" and that Shell's warnings to Kerr-McGee were adequate, the Florida court remanded the case with instructions to direct a verdict in favor of Shell. 425 So.2d at 70.

Similarly in *Jones,* the Kansas Supreme Court held:

> [A] manufacturer of [propane] gas who sells it to a distributor in bulk fulfills his duty to the ultimate consumer when he ascertains that the distributor to whom he sells is adequately trained, is familiar with the properties of the [product] and safe methods of handling it, and is capable of passing on his knowledge to his customers. A manufacturer so selling owes no duty to warn the ultimate consumer, and his failure to do so is not negligence and does not render the product defective.

549 P.2d at 1394. The authorities applying the bulk-seller exception place a greater

burden upon the bulk seller, apparently recognizing that the bulk seller's intermediary is not learned in the sense that the physician is a learned intermediary. Consequently, the bulk seller is charged with the duty not only to warn, but also to "ascertain that the distributor to whom he sells is adequately trained" in use of the product. *See Jones*, 549 P.2d at 1394.

We agree with the reasoning of the cited cases with respect to Velsicol's duty to warn the Khans, as distinguished from a duty to warn Miss Phoebe and its employees. The alleged defect in this case was not the contents of the container but its label, which the Khans never saw and would never have seen in the ordinary course of use of the product by Miss Phoebe. Because Velsicol had no practicable method of warning the Khans or giving them instructions concerning the safe use of the product, the Khans' claim must rest on a duty to provide adequate warnings or instructions to Miss Phoebe. Velsicol cannot escape liability to the Khans if it failed to give adequate warnings or instructions to Miss Phoebe. *See Darryl v. Ford Motor Co.*, 440 S.W.2d 630 (Tex.1969).

The adequacy of warnings and instructions was placed in issue by the Khans' pleadings. The Khans alleged that Velsicol was negligent and that it rendered its product unreasonably dangerous in failing to provide warnings and instructions against use of the product in homes with slab foundations and in failing to warn against drilling into slab foundations without first ascertaining the location of air-conditioning ducts.

The jurisdictions that apply the bulk-seller exception, holding that the bulk seller fulfills its duty to the consumer when it ascertains that the distributor is adequately trained, familiar with the properties and the safe methods of handling, and capable of passing on its knowledge to its customers, also hold that the bulk seller is under no duty to make an expert of the distributor. *See, e.g., Jones*, 549 P.2d at 1394. Further, they hold that knowledge of a fact on the part of the distributor or user satisfies the bulk seller's duty to warn of that fact. *Ragsdale Bros. v. Magro*, 693 S.W.2d 530, 536 (Tex.App.—San Antonio 1985, writ granted).

Here, Velsicol concedes that its label did not warn against drilling into slab foundations and did not instruct the user not to drill into slab foundations without first ascertaining the location of the air-conditioning ducts. Velsicol insists, however, that it was under no duty to warn of this hazard because the hazard was one already well known to Miss Phoebe. To establish this fact, Velsicol points to the deposition testimony of Eugene Beamon, Miss Phoebe's manager of operations.

Beamon had about seventeen years' experience in the pest-control business. He was responsible for and was given authority over all of the company operations, including the hiring and training of operators such as Long. Beamon made the decision whether to treat a particular home and, if any problem was encountered, how to treat it. He was well aware of the dangers associated with the use of Gold Crest C–100. He was also aware that air-conditioning ducts are sometimes found encased in slab foundations. According to Beamon, about sixty percent of the "100 to 200 hundred or more" houses treated by Miss Phoebe's annually are on slab foundations, and perhaps two of the number treated each year contain ducts in the slab. While the ducts within the slabs cannot be seen, their presence can generally be determined by the location of outlets in the floors and walls. However, Beamon testified that the operators are trained to commence drilling through the concrete; then, if the drill bit strikes metal—a pipe, reinforcing bar, or duct—the operator will cease drilling and move to another drill site. Again, according to Beamon, all of these facts known to him were made known to Long through on-the-job training, bulletins published by suppliers, and conferences conducted by suppliers. Finally, strict company policy required any operator to confer with Beamon before undertaking any procedure which was unusual or questionable.

On the other hand, Long's deposition testimony reveals that these instructions, if given, were not understood. Long testified that he did not know the meaning of the word "toxic." When told that a toxin might be dangerous to a human being upon contact with it or upon breathing it, he replied: "Well, I know that anything that's not used properly would not be smart to do, but I don't know anything about how toxic or dangerous." He said he was instructed that "anything that's not used right is wrong, so you have to be careful with it." Long had drilled several slab foundations but had never seen a duct encased in one and had never been told that such a condition might exist. He was, however, aware of the company policy that if he encountered any problem or unusual condition he was to call Beamon before proceeding.

The Gold Crest C–100 label clearly warns of the toxic nature of the substance and of the antidotes to be applied if breathed, swallowed, or touched. The labels instruct in detail the procedure to be followed in treating homes with pier-and-beam foundations, homes with basements, and homes with slab foundations. The instructions do not expressly warn against drilling into slab foundations, nor do they give instructions for doing so safely. Instead, the instructions direct that treatment be made by "rodding" *underneath* the foundation and trenching around its perimeter. The label states: "Apply this product only as specified on this label." Drilling through the slab, therefore, is not a permitted use of the product.

Our reading of the summary-judgment evidence leads us to conclude that most if not all of the expertise possessed by the professional exterminators came from the teaching of the manufacturers and suppliers of the chemicals through bulletins, seminars, and labeling.[2] This conclusion is also consistent with Beamon's deposition testimony regarding instructions from manufacturers and suppliers:

QUESTION: Did they come from any other source?

ANSWER: Before they ever come down to us in writing, we're told about they are coming down or that there will be changes in the labeling instructions.

.    .    .    .    .

QUESTION: Each time the change either came from the supplier or from the manufacturer as opposed to from some Government agency or any other group?

ANSWER: That's true. When we hear it it usually comes from manufacturer or supplier.

QUESTION: In your mind is that purely a recommendation of the manufacturer or suppliers or is that due to some action of some agency or someone else?—if you know?

ANSWER: Well, the label is law and whenever that label changes, we abide by it.

As further example, Beamon was asked if his company did in fact treat buildings with ducts in the slab. He responded:

We did until last year when new labeling came out from the suppliers and they came out and said, "If there is air conditioning ducts imbedded in the concrete slab or anything, they recommended that you did not treat those houses any longer."[3]

██ This evidence shows that Miss Phoebe was fully informed concerning the danger of using Gold Crest C–100 in treating houses with slab foundations and was

---

**2.** This activity on the part of the manufacturer, *i.e.,* the apparent assumption of the duty to adequately train, is consistent with the authorities which place such a duty upon bulk suppliers to ascertain that the user is adequately trained. It is also consistent with our earlier conclusion regarding inapplicability of the learned intermediary doctrine to cases of this kind.

**3.** This testimony does not precisely comport with the actual "new labeling." The new labeling warned against drilling in slabs without first ascertaining the location of ducts. Khan points to the new labeling as evidence of foreseeability on the part of Velsicol. This adds nothing, however, to the knowledge already possessed by Beamon.

fully instructed in methods of avoiding the danger to the occupants that would result from drilling into a slab that might contain air-conditioning ducts. A fact question is raised, however, whether adequate instructions were given to Long, either by Miss Phoebe or by Velsicol's instructions on the container. In product-liability cases, the supplier does not fully discharge its duty by instructing and warning the employer. It must also give adequate instructions and warning to the employee who actually uses the product, if it has a practical means of doing so. On this point, our decision is ruled by *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975), in which the supreme court held that a supplier, which has a duty to make its products reasonably safe for use, is not discharged from that duty by full knowledge of the danger on the part of the employer or supervisor of the employee-user. Other authorities hold that the manufacturer has a duty to warn the employee-user as well as the employer-purchaser. *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1091 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Lopez v. Aro Corp.*, 584 S.W.2d 333, 335 (Tex.Civ.App.—San Antonio 1979, writ ref'd n.r.e.); *see Helicoid Gage Division of American Chain & Cable Co. v. Howell*, 511 S.W.2d 573, 577 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.). J. SALES, PRODUCT LIABILITY LAW IN TEXAS 85 (1985). The manufacturer's liability for lack of adequate warning to the employee-user extends also to other persons injured as a result of improper use of the product. *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936, 940–41 (1972) (toxic fumes in air-conditioning ducts); *cf. Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex.1969) (defective automobile brakes). J. SALES at 435.

■ Likewise in this case, we hold that Miss Phoebe's knowledge concerning the proper method of using Gold Crest C–100 and the danger of drilling into slab foundations did not discharge Velsicol's duty to place adequate warnings and instructions on the label for the benefit of the actual employee-user and others directly affected by his use of the product.

■ Since Velsicol did not supply the product in bulk to Miss Phoebe, but supplied it in containers that could be expected to reach the hands of the employee-user, the question is whether the warning and instructions on the label were adequate as a matter of law. The adequacy of a warning or instruction is generally a question of fact. *Bituminous Casualty Corp. v. Black & Decker Manufacturing Co.*, 518 S.W.2d 868, 873 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.); *Muncy v. Magnolia Chemical Co.*, 437 S.W.2d 15, 19 (Tex.Civ. App.—Amarillo 1969, writ ref'd n.r.e.); J. SALES at 73–76. The label in this case, although warning of the toxic nature of the product and giving instructions for use which, if followed, would have avoided the injuries complained of, did not specifically warn of the danger of drilling into slab foundations where air-conditioning ducts might be located, nor did it instruct the user specifically not to drill into slab foundations without first locating the air-conditioning ducts, as does the label Velsicol has used for this product since Khan's injuries occurred. Consequently, in accordance with *Bituminous Casualty* and *Muncy*, we hold that the adequacy of the warnings and instructions on the label is a question of fact.

### Misuse as Sole Producing Cause

■ Velsicol contends also that the summary judgment in its favor was proper because the sole producing cause, or at least a new and intervening cause, of the Khans' injuries was misuse of the product by Miss Phoebe's employee. Although we may concede that such misuse occurred as a matter of law, it does not follow that misuse was the sole producing cause as a matter of law. The supreme court has rejected misuse of the product as a defense unless the misuse was not foreseeable. *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 351 (Tex.1977). More recently, the supreme court has held that misuse is

not a defense apart from contributory negligence, and then is a defense only to the extent that recovery is reduced on the theory of comparative causation. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 428 (Tex.1984); *Ragsdale Bros. v. Magro*, 693 S.W.2d 530, 541–42 (Tex.App.—San Antonio 1985, writ granted). Since no contributory negligence is alleged on the part of the Khans personally, evidence of misuse may raise the question of apportionment of the loss between Miss Phoebe and Velsicol, but that question is not relevant to the propriety of the take-nothing summary judgment in favor of Velsicol. In a suit against the manufacturer, misuse by a third party is no defense. *Caterpillar Tractor Co. v. Boyett*, 674 S.W.2d 782, 789 (Tex.App.—Corpus Christi 1984, no writ).

"New and independent cause" is not an affirmative defense in a product liability case, but is an element to be considered in determining producing cause; accordingly, whether an intervening act was a new and independent cause is a question of foreseeability. *Dover Corp. v. Perez*, 587 S.W.2d 761, 765 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *cf. Dallas Railway & Terminal Co. v. Bailey*, 151 Tex. 359, 250 S.W.2d 379, 383 (1952) (new and independent cause is an element to be considered in determining proximate cause). Likewise, evidence that the act of a third party was the sole producing cause of the injury does not present an affirmative defense, but only tends to rebut producing cause. *Cf. Atchison, Topeka & Santa Fe Ry. v. Ham*, 454 S.W.2d 451, 456 (Tex.Civ.App.—Austin 1970, writ ref'd n.r.e.) (sole proximate cause only indicates that the defendant's negligence did not contribute to the plaintiff's hurt).

In determining whether an inadequate warning label on a dangerous product was a producing cause or cause in fact of the injury complained of, there is a rebuttable presumption that the user would have read and heeded an adequate warning. *Technical Chemical Co. v. Jacobs*, 480 S.W.2d 602, 606 (Tex.1972). Consequently, unless there is conclusive evidence that the manufacturer could not foresee the particular misuse, or conclusive evidence that a warning, if given, would not have been heeded, a fact issue is presented on producing cause. *Ragsdale Bros.*, 693 S.W.2d at 541; *Tucson Industries Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936, 941 (1972). Adequate warning may be necessary even in the case of an experienced mechanic, and use of a product by untrained or uninformed workmen can be anticipated. *Hamilton v. Motor Coach Industries, Inc.*, 569 S.W.2d 571, 576–78 (Tex.Civ.App.—Texarkana 1978, no writ).

■ In the present case we cannot say as a matter of law that Velsicol could not have foreseen the type of product misuse shown here. Nor can we say as a matter of law that a specific warning and instruction on the label, such as that later employed, would not have prevented the Khans' injury. Consequently, we hold that Miss Phoebe's misuse of the product was not the sole producing cause as a matter of law.

### Agency of Miss Phoebe for the Khans

Another ground asserted in Velsicol's motions for summary judgment was that Miss Phoebe became the agent of the Khans for choosing and applying Gold Crest C–100, and thus the acts and knowledge of Miss Phoebe are imputed to the Khans. Velsicol cites cases from the law of contracts such as *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 300 (Tex.1981), and *Westchester Fire Ins. Co. v. English*, 543 S.W.2d 407, 412 (Tex.Civ.App.—Waco 1976, no writ), holding that the knowledge of an agent is imputed to his principal. On this appeal the Khans contend that the acts and knowledge of Miss Phoebe cannot be imputed to them because under *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975), the duty to warn and instruct the employee-user concerning use of a dangerous product is not satisfied or excused by the knowledge of the employer-purchaser.

We recognize that *Rourke* concerned the somewhat different question of imputation

of an employer's knowledge to an employee-user, rather than imputation of an agent's knowledge to his principal. Nevertheless, we conclude that the summary judgment cannot be supported on the theory of either imputed acts or imputed knowledge. Velsicol cites no authority for application of the contract rule of imputed knowledge to bar recovery in a tort suit for personal injuries, and we have found none. Such imputed knowledge, however, would be irrelevant because in this case even actual knowledge would not bar recovery. Even if the Khans had been fully advised concerning the danger of Gold Crest C–100 and had been fully instructed concerning its safe use, as was Miss Phoebe, that knowledge would not have prevented the Khans' injuries. Admittedly they relied on Miss Phoebe to select and apply a pesticide, but, so far as appears, Miss Phoebe was an independent contractor, and, therefore, the Khans could not reasonably be expected to supervise Miss Phoebe's employees in this work. Consequently, there is no basis for a presumption that such a warning or instruction to the Khans would have been heeded by Long and thus would have prevented the Khans' injuries. If actual knowledge would not have barred their recovery, it would be illogical to hold that imputed knowledge would have that effect.

■ The crucial question, then, is whether recovery is barred by Miss Phoebe's acts, including injection of the product into the air-conditioning duct, that is, its misuse of the product. This question must be analyzed in the light of the tort principles already discussed. For the reasons stated in our discussion of the sole producing cause question, we hold that Miss Phoebe's misuse is not a complete bar to recovery because it has not been shown to be unforeseeable as a matter of law. Consequently the summary judgment cannot be supported on the theory of imputed acts or imputed knowledge. The motion for summary judgment does not raise the question whether Miss Phoebe's misuse may be imputed to the Khans so as to be available to Velsicol as a partial defense under the comparative causation theory announced in *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 428 (Tex.1984).

### Breach of Warranty

We conclude also that the trial court erred in granting summary judgment in the Khans' statutory claims. The Khans alleged that Velsicol impliedly warranted, pursuant to section 2.314 of the Texas Business and Commerce Code (Vernon 1968), that the product was merchantable and fit for its ordinary use, and also warranted, pursuant to Section 2.315 of the Code, that it was fit for the particular purpose for which it was to be used. The Khans further alleged that Velsicol's breaches of these warranties in failing to give adequate warnings and instructions constituted a violation of the Deceptive Trade Practices Act, which includes among the enumerated "false, misleading, or deceptive acts or practices" the following:

> representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve....

TEX.BUS. & COM.CODE ANN. § 17.-46(b)(19) (Vernon Supp.1986).

Velsicol urged in its motion for summary judgment that the Khans cannot recover damages for violation of the Deceptive Trade Practices Act because the Khans did not rely on any misrepresentations by Velsicol. On appeal, the Khans contend that since there is no requirement of privity between the Khans and Velsicol, there is no requirement that the Khans rely on anything Velsicol said. They contend further that Velsicol, in order to support its motion for summary judgment, had the burden to prove, not only that they did not rely on any misrepresentation by Velsicol, but also that Miss Phoebe and Long did not rely on any such representations.

■ In this respect we conclude that the summary-judgment proof establishes that neither the Khans, Miss Phoebe, nor Long relied on any misrepresentations by Velsicol. The undisputed evidence shows that the Khans did not know what pesticide was applied to their house and that Miss Phoebe

had full information concerning the dangers of using Gold Crest C–100 in houses with slab foundations and the proper method to avoid injecting the product into air-conditioning ducts enclosed in slab foundations. The evidence also shows that Velsicol made no representation to Long, as distinguished from Miss Phoebe. Consequently, we conclude that the evidence conclusively negates any issue of fact as to whether any representation by Velsicol within section 17.46(b)(19) of the Deceptive Trade Practices Act was a producing cause of the Khans' injuries. We do not consider whether the Khans are entitled to recover under any other provisions of the Act.

■ The Khans contend further, however, that no reliance on misrepresentation is necessary when the plaintiff alleges breach of an implied warranty within sections 2.314 and 2.315 of the Texas Business and Commerce Code. In this respect we agree with the Khans. These sections, when taken in connection with section 2.715 of the Code, establish an alternative remedy to strict liability in tort with respect to personal injuries suffered from a defective product, and no privity is necessary. *Garcia v. Texas Instruments, Inc.*, 610 S.W.2d 456, 462, 465 (Tex.1980). J. SALES at 122–126. These warranties are not based on any express representation, but are implied in the contract of sale unless excluded or modified. Sections 2.314(a), 2.315. Consequently, reliance on a representation is not an element of a claim for breach of implied warranty.

We do not consider whether all the elements of a cause of action for breach of implied warranty within Sections 2.314 and 2.315 are raised by the summary-judgment proof, or even by the Khans' pleadings in the present case. We hold only that Velsicol is not entitled to summary judgment with respect to these statutory claims on the ground alleged in its motion, namely, that the summary-judgment proof shows conclusively that breach of warranty by Velsicol was not a producing cause of the Khans' injuries because they did not rely on any representation by Velsicol.

The Khans' motion for rehearing is granted, our former opinion is withdrawn, our former judgment is vacated, and the cause is reversed and remanded.