Andrew TORRES; Amanda Torres, husband and wife; Walter Torres; Debra Torres, Plaintiffs–Appellants,

v.

GOODYEAR TIRE & RUBBER COMPANY, INC., an Ohio Corporation, Defendant–Appellee.

No. 87–2062.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 18, 1988.

Decided Sept. 20, 1988.

Richard D. Engler, Engler, Engler, Weil & Nelson, Yuma, Ariz., for plaintiffs-appellants.

Jefferson L. Lankford, Jennings, Strouss & Salmon, Phoenix, Ariz., for defendant-appellee.

Appeal from the United States District Court for the District of Arizona.

Before SNEED, HALL and NOONAN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Plaintiffs-appellants the Torreses sue to recover for personal injuries suffered as a result of an automobile accident. The district court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (1982). The district court granted summary judgment in favor of defendant-appellee Goodyear Tire & Rubber Company ("Goodyear") concluding that "neither the Arizona courts nor the Arizona legislature have accepted the expansive liability doctrines argued by the plaintiffs." We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982). We affirm.

I

The pertinent facts, briefly stated, are as follows. Andrew and Walter Torres were injured in an automobile accident allegedly caused by the tread separation of a tire on an automobile driven by Walter, a 1977 Triumph manufactured in Great Britain. The tire was original equipment on the automobile which was purchased by Walter's wife, Debra. The car's allegedly defective tire bore the legend "Goodyear." The Torreses assert that Goodyear is liable for the resulting damages under four different theories: enterprise liability, apparent manufacturer liability, agency liability, and breach of warranty.

The tire was manufactured in Wolverhampton, England by Goodyear Tyre & Rubber (Great Britain), Ltd. ("Goodyear GB"). Goodyear International Technical Center ("Goodyear Technical Center"), a division of Goodyear SA of Luxembourg, designed the tire. Either Goodyear SA of Luxembourg or Goodyear GB issued the tire specifications. According to the Torreses, Goodyear operates its foreign subsidiaries, with the exception of its Canadian subsidiary, through Goodyear International Corporation.

Goodyear GB, Goodyear SA of Luxembourg, and Goodyear International Corporation are all Goodyear subsidiaries. Because Goodyear owns most or all of its subsidiaries' stock, it is able to elect the

corporate directors and thereby control the subsidiaries. There is commonality between some of the officers and directors of Goodyear and its subsidiaries.

Goodyear's support for its tires extends from research and development to trademark licensing, and from warranting to advertising. Goodyear's trademark is registered and its use is conditioned on Goodyear's control of the manufacturer. Goodyear is responsible for quality assurance and control of all tires manufactured by its foreign subsidiaries. It will honor any valid warranty claim on a tire that bears a Goodyear trademark and is produced by either Goodyear or a foreign subsidiary.

Pursuant to a licensing agreement with Goodyear, Goodyear GB may manufacture tires bearing the Goodyear trademark. The Licensing Agreement provides for manufacture of the tires in accordance with the formulas, specifications, and directions given by Goodyear. Only materials approved by Goodyear may be used. Goodyear GB must comply with Goodyear's instructions on production, labeling, marketing, and packaging of these tires.

## II

We review the grant of summary judgment *de novo. California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Under Fed.R. Civ.P. 56(c), summary judgment is appropriate if the pleadings and supporting materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

## III

The Torreses claim that Goodyear is liable under an "enterprise theory" of liability. The district court found that this claim lacked an essential element of strict liability under Arizona statutory and case law: the defendant must have designed, manufactured or sold the defective product.

As a federal court sitting in diversity, we must apply Arizona substantive law. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Because the Arizona Supreme Court has not considered the issue of strict liability of trademark licensors, we must determine the result the Arizona Supreme Court would reach if it were deciding the case. *Molsbergen v. United States,* 757 F.2d 1016, 1020 (9th Cir.), *cert. denied,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). In determining what the Arizona Supreme Court would conclude, we may consider recognized legal sources including statutes, treatises, restatements, and published opinions. *Id.* We also may look to "well-reasoned decisions from other jurisdictions." *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980). We review *de novo* the district court's determination of the applicable state law. *In re McLinn,* 739 F.2d 1395, 1400 (9th Cir.1984) (en banc).

Arizona has adopted section 402A of the Restatement (Second) of Torts which imposes strict liability on "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property." In *Tucson Industries, Inc. v. Schwartz,* 108 Ariz. 464, 501 P.2d 936 (1972), the Arizona Supreme Court explained strict liability as a rule placing the burden of loss on " 'those persons who are in the chain of placing defective goods on the market.' " *Id.* at 467, 501 P.2d at 939 (quoting *Caruth v. Mariani,* 11 Ariz.App. 188, 192, 463 P.2d 83, 87 (1970)). "Strict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know-how to remove its defects before placing it in the chain of distribution." *Id.,* 108 Ariz. at 467–68, 501 P.2d at 939–40. We find no support in Arizona law, however, for the Torres' argument that we should deduce from these policy statements a willingness on the part of the Arizona Supreme Court to impose strict liability on trademark licensors.

Arizona's product liability statute, Ariz. Rev.Stat.Ann. §§ 12–681–686 (1982), de-

fines a "product liability action" as one "brought against a manufacturer or seller of a product...." "Manufacturer" and "seller" are defined as follows:

"Manufacturer" means a person or entity who designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product prior to its sale to a user or consumer, including a seller owned in whole or significant part by the manufacturer or a seller owning the manufacturer in whole or significant part.

"Seller" means a person or entity, including a wholesaler, distributor, retailer or lessor, engaged in the business of leasing any product or selling any product for resale, use or consumption.

§ 12–681(1), (5).

In addition to "manufacturers" and "sellers," Arizona courts have found a variety of entities to be integral parts of an enterprise responsible for placing allegedly defective products on the market: a lessor, *Sequoia Mfg. Co. v. Halec Constr. Co.*, 117 Ariz. 11, 570 P.2d 782 (Ct.App.1977); a dealer in used goods, *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 660 P.2d 1236 (Ct.App.1983); a retailer, *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968) (en banc); a jobber, *Tucson Industries, supra;* a distributor, *Lunt v. Brady Mfg. Corp.*, 13 Ariz.App. 305, 475 P.2d 964 (1970); and a packager, *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (Ct. App.1978). However, no Arizona court has considered the precise issue of whether a trademark licensor is strictly liable for personal injuries caused by a defective product bearing its trademark.

In other jurisdictions that have considered the issue, some courts have concluded that strict liability should attach to the trademark licensor as one within the "stream of commerce" in which the product flows. *See Connelly v. Uniroyal, Inc.*, 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979), *cert. denied and appeal dismissed*, 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980); *City of Hartford v. Associated Construction Co.*, 34 Conn.

Supp. 204, 384 A.2d 390 (Super.Ct.1978); *Kasel v. Remington Arms Co.*, 24 Cal.App. 3d 711, 101 Cal.Rptr. 314 (1972). *Accord Kosters v. Seven–Up Co.*, 595 F.2d 347 (6th Cir.1979) (applying Michigan law, franchisor liable under implied warranty theory); *Harris v. Aluminum Co. of America*, 550 F.Supp. 1024 (W.D.Va.1982) (applying Virginia law, same); *Taylor v. General Motors, Inc.*, 537 F.Supp. 949 (E.D.Ky. 1982) (applying Kentucky law, strict liability applies to one exercising strict control over design and testing of defective product); *Carter v. Joseph Bancroft & Sons Co.*, 360 F.Supp. 1103 (E.D.Pa.1973) (applying Pennsylvania law, trademark licensor strictly liable as "seller"). Some commentators have agreed. *See* 2 L. Frumer & M. Friedman, *Products Liability* § 3.03[4][b][viii] at 3–456 (1988); Note, *Tort Liability of Trademark Licensors*, 55 Iowa L.Rev. 693 (1970).

In this case, however, we hesitate prematurely to extend the law of products liability in the absence of an indication from the Arizona courts or the Arizona legislature that such an extension would be desirable. We have limited discretion in a diversity case "to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir.1987); *see Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 694–95 (1st Cir.1984); *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. Unit A 1980). Further, our unwillingness to speculate on any trends in state law "applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court." *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987); *see Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985). Here, the Torreses chose to file their complaint in federal court.

■ Finally, there is no compelling reason for this court to expand the scope of Arizona products liability law notwithstanding our limited discretion. The

Torreses are not without a remedy. For example, they may sue either the manufacturer, Goodyear GB, or the designer, Goodyear Technical Center, or both. *See Affiliated FM Ins. Co.*, 831 F.2d at 155. Therefore, we hold that under existing Arizona law, a trademark licensor is not strictly liable for injuries caused by defective goods bearing its trademark under an "enterprise theory" of liability.

## IV

■ The Torreses next contend that Goodyear should be held strictly liable under section 400 of the Restatement (Second) of Torts because it was the apparent manufacturer of the tire. Section 400 states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

We reject this argument. First, Arizona has not adopted the apparent manufacturer doctrine. Second, even if section 400 were adopted by the Arizona Supreme Court, Goodyear did not "put out" the allegedly defective tire within the section's meaning. The cases which apply the apparent manufacturer doctrine demonstrate that section 400 applies only where a retailer or distributor has held itself out to the public as the manufacturer of the product. *See Dudley Sports Co. v. Schmitt,* 151 Ind.App. 217, 279 N.E.2d 266 (1972) (distributor); *Burkhardt v. Armour & Co.,* 115 Conn. 249, 161 A. 385 (1932) (suppliers of canned meat). *Accord Affiliated FM Ins. Co.,* 831 F.2d at 155–56; *Nelson v. International Paint Co.,* 734 F.2d 1084, 1087–90 (5th Cir.1984) (trademark licensor does not "put out" a chattel within the meaning of section 400).

Goodyear was not the manufacturer of the allegedly defective tire. Furthermore, Goodyear was not the seller of the tire to which section 400 imputes the actual manufacturer's liability. Accordingly, the

Torres' reliance on section 400 to impose liability on Goodyear is misplaced.[1]

## V

■ The Torreses assert that principles of apparent agency or agency by estoppel compel treatment of Goodyear GB as an agent of Goodyear. In Arizona, the touchstone of apparent agency is the "conduct of a principal that allows a third party reasonably to conclude that an agent is authorized to make certain representations or act in a particular way." *Miller v. Mason–McDuffie Co. of So. Cal.,* 153 Ariz. 585, 589, 739 P.2d 806, 810 (1987) (en banc). "[I]f the principal's conduct creates apparent authority, the principal is subject to liability for the agent's actions even if the agent was acting for his own purposes." *Id.* As to this theory, Goodyear has shown that there is no genuine issue of material fact.

The Torreses have pointed to no evidence that Goodyear created the impression that Goodyear GB acted as its agent. Goodyear advertising might create the impression that tires with the Goodyear trademark are of outstanding quality. That impression, however, in and of itself does not reasonably lead to the conclusion that anyone using the Goodyear trademark is a Goodyear agent whose corporate separateness should be disregarded.

Even if the Torreses could demonstrate that there was a material dispute of fact about whether Goodyear represented Goodyear GB as its agent, they must still show that Debra Torres, when she purchased the Triumph together with its Goodyear tires, reasonably relied upon the agent's apparent authority. *Id.* at 590, 739 P.2d at 811; *Koven v. Saberdyne Systems, Inc.,* 128 Ariz. 318, 322, 625 P.2d 907, 911–12 (Ct. App.1980). The Torreses cannot claim, however, that Debra Torres believed that Goodyear GB acted as an agent of Good-

---

1. Our conclusion that section 400 does not apply to the facts of this case buttresses our holding that imposing strict liability on Goodyear based on an "enterprise theory" of liability would represent a speculative departure from Arizona law. *See City of Hartford, supra* (section 400 applied in conjunction with section 402A to con-clude that trademark licensor is strictly liable under "stream of commerce" theory). *Accord Carter,* 360 F.Supp. at 1106–07 (section 400 applied in conjunction with section 402A to conclude that trademark licensor is a "seller" as defined by section 402A).

year. When she purchased the Triumph, she was unaware of Goodyear GB.

## VI

■ The Torreses attempt to base Goodyear's liability upon two warranty theories derived from *Flory v. Silvercrest Industries, Inc.*, 129 Ariz. 574, 633 P.2d 383 (1981) (en banc). As to these theories as well, Goodyear was entitled to summary judgment. Neither theory supports the Torres' claim because both are based upon an express warranty given by the manufacturer. Here, the Torreses have presented no evidence of a similar warranty by Goodyear. Moreover, Goodyear was not the manufacturer of the defective tire and the record is clear that Debra Torres did not rely on any Goodyear warranty in purchasing the Triumph, which happened to have Goodyear tires.

AFFIRMED.

NOONAN, Circuit Judge, concurring and dissenting:

In 1964 the American Law Institute adopted § 402A of the Restatement (Second) of Torts. It provided that the seller of a product in a defective condition unreasonably dangerous to the users was liable for the physical harm caused by the product to the ultimate users if the seller was in the business of selling the product and it was expected that the product would reach the user without substantial change in the condition in which it was sold. The rule applied although the user was not in any contractual relation with the seller.

The rationale for the rule was that "by marketing his product for use and consumption" the seller had undertaken a special responsibility toward the user; that the public in buying goods where it was forced to rely upon the seller had a right to expect that "reputable sellers" would stand behind their goods; and that the burden of accidental injuries caused by such products should be placed "upon those who market them." Restatement (Second) of Torts § 402A comment c (1964).

Arizona adopted the Restatement in 1968. *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968). The court reaffirmed its commitment to the Restatement in 1972. *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972). The court declared, "Strict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe to those who marketed the product, profit from its sale and have the know-how to remove its defects before placing it in the chain of distribution." *Id.* at 467–68, 501 P.2d at 939–40.

In 1976 Arizona codified the law to a degree by providing a statute of limitations, affirmative defenses, a rule as to indemnification, a rule as to the contents of the complaint, a rule as to evidence, and certain definitions. Ariz.Rev.Stat.Ann. §§ 12–681–686. "The previously existing common law of products liability" was "modified" only to the extent thus provided. *Id.* at § 12–682. Nothing in the statute changed the rationale for imposing product liability.

Since the adoption of the rule, Arizona has imposed product liability on a variety of actors other than those meeting the precise statutory definition of manufacturer or seller. As is observed by this court, those held liable have included a lessor, a dealer in used goods, a jobber, a distributor and a packager. The common thread has been that each of those held liable has been in the chain of distribution.

Now we are asked if the Arizona law of product liability applies to Goodyear Tire and Rubber Co., Inc. We may apply the tests provided by the Supreme Court of Arizona:

*First.* Does Goodyear have the know-how to remove defects from a tire before placing the tire in the chain of distribution? The licensing agreement between Goodyear and Goodyear GB permits the latter to manufacture tires in strict accordance with the formulas, specifications, and restrictions given by Goodyear. Only materials approved by Goodyear may be used. Goodyear reserves the right to inspect the plant and tire samples of Goodyear GB. In addition, Goodyear does all the basic product

research for tires at its Akron, Ohio headquarters. The research results are transmitted to the development department of the Goodyear Technical Center in Luxembourg. This center is the development department for Goodyear GB. Quality control is Goodyear's responsibility. Goodyear is so sure of its quality control of those tires produced by Goodyear GB that it will honor any warranty claim on these tires.

*Second.* Does Goodyear market the tires? Goodyear is famous for its advertising. The Goodyear Blimp has carried the Goodyear name over countless stadiums in America. Goodyear runs its advertising on a global basis. In 1986, for example, it used worldwide a single theme: "Goodyear, Take Me Home." *Advertising Age,* September 24, 1987, at 110, col. 5. In 1986 Goodyear spent $161 million to advertise its name in the United States. *Id.* at 1.

*Third.* Does Goodyear profit from the sale of its tires by Goodyear GB? Goodyear charges Goodyear GB about $10 million annually for its technical services. There is no reason to believe that these services are provided at cost. Goodyear directs and coordinates its investment in Goodyear GB through another subsidiary, Goodyear International, located at corporate headquarters in Akron. Goodyear International chooses the board of Goodyear GB. Goodyear International decides how much capital to allocate to Goodyear GB. Goodyear International is involved in all major financial decisions of Goodyear GB. The financial figures for Goodyear GB are consolidated on Goodyear's balance sheet. Except for directors' qualifying shares, Goodyear owns all the common stock of Goodyear GB. It is obvious that Goodyear is in a position to profit from the sales of Goodyear GB. "Goodyear's net profit during the first half of 1987 was $425.2 million. *Advertising Age,* Sept. 24, 1987, at 111, col. 1." A portion of this profit came from Goodyear GB.

The opinion of this court notes that "the precise issue" presented by this appeal has not been decided by an Arizona court. This court arrives at this phrasing of the issue by singling out a single aspect of Good-year's relation to Goodyear GB—that of trademark licensor. This narrow focus on a single portion of the relationship misses the point of the Arizona doctrine and fails to respond to the rationale of the rule.

To take a variation on a familiar illustration, if a court holds that barking dogs are a nuisance to the neighborhood because of their noise, it has not decided the precise issue of whether braying asses are a nuisance. But could any reasonable person doubt how the court would decide the case of the braying asses if the court was respectful to the rationale for banning the barking dogs?

To avoid what Arizona law requires, the court has committed a major blunder in federal law. The court suggests that plaintiffs, because they have chosen a federal court, should be treated differently from defendants in the application of state law. When Austin Scott taught Civil Procedure at Harvard Law School, he used to ask the students, "Are you pro-plaintiff or are you pro-defendant?" The question from Scott was ironic, a kind of reductio ad absurdum. But the court here is willing to take this absurd position, to say that plaintiffs will not fare as well as defendants.

The "precise issue," in the court's phrasing of the matter, is as undecided as to the defendant as it is to the plaintiff. Would the court have come to a different conclusion if Goodyear had brought a declaratory judgment action and been in the posture of a plaintiff asking the court to say that it was not liable? The court's position is untenable.

Federal diversity jurisdiction does not exist for the convenience of federal judges. Long ago, Chief Justice Stone put to rest such a view of the function of federal judges determining state law. *Meredith v. City of Winter Haven,* 320 U.S. 228, 234, 64 S.Ct. 7, 10, 88 L.Ed. 9 (1943). Federal judges are bound to apply the law of the state as enunciated by its highest court. It is unwarrantable disparagement of the Supreme Court of Arizona for the court to take the position that that court would find Goodyear—which carefully develops Goodyear tires from scratch, lavishly markets

**1300**

them, and richly profits from their sale—not liable for the defective condition of a Goodyear tire.

Worldwide the company tells its customers, "Take Me Home." When they take Goodyear home, are they then to discover that there are many Goodyears and these many Goodyears are not responsible for each other? What Goodyear's lawyers should be telling the company is, "Goodyear, come home." If Goodyear is "a reputable seller" it will stand behind its product. If it does not do so, the court should make it answer. I agree with the court that Goodyear cannot be held liable for the injuries in this case under a warranty theory, an agency theory, or as one "putting out" a product under section 400 of the Restatement (Second) of Torts. But in Arizona Goodyear is liable under section 402A. I would reverse.